## THE FANWOOD.[1]

### DENTZ et al. v. THE FANWOOD.

(District Court, S. D. New York. May 18, 1894.)

1. COLLISION BETWEEN STEAMERS — PROXIMITY TO PIERS — DISABILITY OF ENGINE.

A tug proceeding, without necessity, about 150 feet from ferry slips, reversed to go astern of a ferryboat coming out on her starboard hand. Her engine caught on the center, the engineer was slow in prying it off, her pilot gave no signal to indicate her disability, and, although the ferryboat reversed as soon, apparently, as her pilot had reason to suppose that the tug would not keep out of the way, the vessels collided. *Held*, that the ferryboat was not in fault.

2. ADMIRALTY — EVIDENCE — ADMISSIONS OF PILOT.

The admissions of the pilot of a colliding vessel, not being part of the res gestae, are not competent evidence against the ship owner.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

This was a libel by George H. Dentz and another against the ferryboat Fanwood for damages to libelants' steam tug Treush by collision.

McCarthy & Berier, for libelants.

De Forrest Bros., for claimants.

BROWN, District Judge. The Treush, going down the Hudson river about 150 feet distant from the end of the piers, came in contact with the ferryboat Fanwood as she was leaving her slip at Communipaw. When some 250 or 300 feet distant, signals of one whistle were exchanged, which, under ordinary circumstances, would have been in abundant time to enable the tug to keep out of the way of the Fanwood, as it was her duty to do, by stopping and going under the ferryboat's stern. But the tug's engine caught upon the center when the order to reverse was given, and this was the primary cause of the accident. The pilot of the Fanwood, when about 125 feet from the tug, gave a signal of three whistles. The tug gave no answer, and, continuing on unchecked, her stem struck the port guard of the ferryboat at her forward hood, thereby doing herself some damage, for which the above libel was filed.

Assuming that the liability of an engine to catch on the center, and thus delay reversing, is unavoidable, it was the tug's fault, and at her risk, to proceed, without necessity, so near to the end of the piers and ferry slips, where, in case of this temporary disabling of her engine, she would not have either time or space for the performance of her duty to keep out of the way after the ferryboat was seen to be coming out of her slip. The pilot of the Treush, moreover, when he found that his engine was slow in reversing, and had caught upon the center, should have hailed the ferryboat, or given alarm whistles to indicate his disability. He would have done so had he not supposed, as he testifies, that the engine would get to working backwards in time to enable him to keep out of the Fanwood's way. For this reason, apparently, he did not even answer the alarm signals of the Fanwood. If the testimony of one of the witnesses for the libelants is correct,—that 15 seconds was sufficient time for the engineer to pry the engine off the center, and get reversing,—the captain was justified in his expectation, and the additional delay was the engineer's fault.

The libelants' testimony shows that the Fanwood, coming out of her slip under one bell at the speed she was making, could have come to a stop within an advance of 50 feet. As the alarm whistle of the Fanwood was given when she was 125 feet distant, this evidence (which has not been contradicted by the defendant) indicates that the Fanwood might have been brought to a stop before reaching the line of the tug's course. The evidence leaves no doubt, however, that the Fanwood was still under considerable headway when her guard at her forward hood came in contact with the tug, since the latter was given by the shock a strong list to port, which threw overboard two men on board the tug. The

Fanwood is sought to be held on the ground that it was her duty to reverse sooner than she did, and in time to avoid a collision; because, as it is said, she ought to have perceived and known that the tug was, from some cause, helpless, and that the duty of keeping out of the way, therefore, devolved on the Fanwood. There is no doubt of this obligation, if the Fanwood knew, or had sufficient reason to suppose, that the tug was disabled in time to avoid her. But the circumstances do not seem to me to justify this assumption. The tug was a small boat, and unincumbered; she was presumptively capable of being handled with great ease and facility. The West Brooklyn, 45 Fed. 60, 61. She was going slowly, making only about four knots, and could ordinarily stop and turn within a very short distance,—just how quickly the pilot of the Fanwood did not know, and was not presumed to know, as well as the tug's pilot. The tug could certainly stop, ordinarily, within short hailing distance. As soon as she became subject to any disability which would prevent her stopping in time, it was certainly her pilot's duty to give notice of it to the Fanwood when he came within reasonable hailing distance of her, or by previous signals. He did neither; and, in the absence of any hail or signal from the tug, the pilot of the ferryboat was not called on to imagine that any such disability existed, or to suppose that the tug would not stop in time. The ferryboat reversed before the collision, and her quick water carried the tug ahead of her after the collision. I do not see any evidence sufficient to show that the pilot of the ferryboat did not reverse as soon as he had reason to suppose that the tug could not or would not keep out of the way. The West Brooklyn, 45 Fed. 60, affirmed 1 U. S. App. 88, 1 C. C. A. 415, 49 Fed. 688.

According to the testimony, the causes of the collision, independently of the catching on the center, were: (1) The false position of the tug; (2) the engineer's tardiness in getting her off the center; and (3) the captain's failure to hail or signal his disability. The evidence of the pilot's admissions, not being a part of the res gestae, but made some time afterwards, are not, as I understand, competent evidence against the owner; it is only the master whose admissions, as the general representative of the owner, are thus admissible. The Enterprise, 2 Curt. 320, Fed. Cas. No. 4,497; La Champagne, 3 C. C. A. 539, 53 Fed. 293. The libel must therefore be dismissed.