## THE RALPHIE B.

## THE CARDINAL.

## BOUCHARD TRANSP. CO., Inc., v. CITY OF NEW YORK.

### No. 17027.

District Court, E. D. New York.

Nov. 28, 1945.

Mahar & Mason, of New York City (Frank Mason, of New York City, of counsel), for libelant.

Ignatius M. Wilkinson, Corp. Counsel, and Edwin M. Bourke, Asst. Corp. Counsel, both of New York City, for City of New York.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for tug Cardinal and Fred B. Dalzell.

KENNEDY, District Judge.

This is a cause of collision. On February 3, 1944, at approximately 8:45 p. m. the ferryboat Tremont was leaving the ferry slip at 39th Street on a voyage to Staten Island. Pier 8 is immediately to the south of the slip. At about the same time the tug Cardinal had picked up the barge Ralphie B at the south side of Pier 8. Ralphie B was moored along the south side of the pier with her stern toward the stream. Cardinal came alongside of Ralphie B, port side to, and put on a line.

Cardinal is about 86 feet registered length, and 102 feet overall length; Ralphie B is 105 feet long. The topmost of Cardinal's towing lights was about 30 feet above the

water's edge; the lowest towing light was about 28 feet above the water's edge. The tide was ebbing and the top of the ferry racks at the end of Pier 8 were about 8 feet above the water's edge. Cardinal was showing two lights on her staff, red and green sidelights, and a white headlight. These lights were therefore visible, so far as Tremont was concerned.

After Cardinal had backed out into the stream she stopped her engines and began to come ahead on left rudder in order to make a course toward Gowanus. She was then about 70 feet off the rack at the end of Pier 8.

As Tremont came out of the slip she blew her slip whistle. The evidence is conflicting concerning when she commenced to give that signal, and when she stopped. Her master says he began to blow the slip whistle when he was about half-way out of the slip, and at about the same time he stopped his engines. The slip is about 900 feet long. Tremont's overall length is 151 feet. She is about 42 feet wide, and her pilot house is about 30 feet aft of her bow.

Tremont claims that she hugged the north rack of the slip with right rudder and was merely carried out toward the stream, after her engines had been stopped, on the headway she had gathered. She had no lookout as she emerged from the slip: one deckhand was going into the pilot house, the other was chocking automobiles. Her master says that as he emerged from the slip with right rudder he sighted Cardinal and her tow about 200 feet away to the south and about 50 feet off the end of Pier 8. As soon as he saw this he says he blew an alarm and put his engines into reverse.

Meantime, Cardinal, which was just completing its maneuver of straightening out for Gowanus, was proceeding under one bell ahead, but she had not yet gathered much headway. According to her master's version, after Cardinal straightened out, and just as her pilot house cleared the southerly rack of the ferry slip (Tremont was then 125 feet inside of the slip), the latter's slip whistle was sounded. Cardinal's master then claims that he immediately stopped his engines and reversed. This caused the tug and her barge to swing around to starboard. While they were on the swing the collision occurred, the port side of Tremont's bow coming into contact with the starboard forward corner of the barge.

Cardinal was clearly at fault. Had she backed further into the fairway until she was well off Pier 8, it is difficult to see how the collision could have occurred, no matter what Tremont did. I do not find Cardinal guilty of excessive speed. But when she straightened out for Gowanus, she was certainly no more than 70 feet off the rack at the end of Pier 8. This is too close for comfort, taking into consideration that she was practically at the mouth of a ferry slip. It is urged on behalf of Tremont that on the basis of distance from the pier head, under any and all circumstances, a tug in Cardinal's position is automatically at fault. Of course, that is not so, because there cannot be a hard and fast rule about such matters. But in the circumstances of this case, Cardinal was much too close (she did this to save time, I think).

█ Because Cardinal was so clearly at fault, Tremont urges that I should not be zealous to find errors on her own part. The City of New York, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84. Indeed, she says in behalf of all ferryboats that they have a special privilege of exit and entrance from and to their slip which requires other ships to keep as near as possible to the center of the stream in order that the ferries may not be checked or embarrassed. The Breakwater, 1894, 155 U.S. 252, 262, 15 S.Ct. 99, 39 L.Ed. 139. I acknowledge that both of these propositions are sensible, and have tried to give them due weight. But I suspect that both of them have been overworked in the case of ferryboats, and the case at bar illustrates that.

The master of Tremont told how he came out of the slip, hugging the north rack, making very little headway under right rudder. He then sighted Cardinal 200 feet to his left, the slip being 250 feet wide. An instant after he says the Cardinal had "loomed up" the collision occurred, within 50 feet off the south rack of the slip, the colliding vessels being at least 50 feet out in the stream. Every allowance for the ebb tide can be made, and still the collision could not have occurred that way.

Cardinal, just prior to the collision, was not making any great headway. Under the undisputed facts she could not have been making much headway. Moreover, a passenger on the ferryboat (called in the case by Tremont) testified quite clearly, not once but several times, that just before the collision the ferryboat "tended to veer

a little bit toward the southerly." This was at a time when she was not yet out of the slip, and when her master testified she could not have been making much leeway. I regard this evidence as highly significant. It leads me to find that just before the collision Tremont, instead of hugging the north rack with her engines stopped, was cutting across the slip, a manifestly dangerous maneuver if she saw Cardinal and her tow. But she did not see Cardinal, although the latter's staff lights and running lights were burning brightly and were visible over the south rack.

Two deckhands were available for lookout duty on Tremont. One of them was chocking up automobiles, as I have said, and the other was entering the pilot house. The master manifestly could not have discharged the duties of lookout. All of this points to the fact that as she was emerging from the slip, Tremont did not see Cardinal at all, because if she did, she would, in fact, have hugged the north rack (as she now claims she did) and the collision, in all likelihood, would not have happened.

There was much debate in the briefs concerning what article of the Inland Regulations was applicable. In his testimony the master of Tremont said he thought the starboard hand rule applied, but that he "waived it." This sounds like an incomprehensible statement, but it really is not. What the master evidently had in mind was that if the starboard hand rule applied, his own ship was at fault in not maintaining course and speed, therefore the assertion of "waiver." And a rather remarkable argument in this connection is advanced in behalf of Tremont. It is said that so far as she herself was concerned the rule of special circumstances (Article 27 of the Inland Regulations) was applicable, but so far as Cardinal was concerned she should have governed herself by the starboard hand rule as the burdened vessel (Article 19 of the Inland Regulations). This in part, at least, is what I meant when I said the ferryboat decisions may have at time been overworked. Remembering that the master of Tremont said he first saw Cardinal's lights 200 feet off his port bow, and having in mind what Tremont's deckhands were doing just before the collision, the language of Judge Coxe in The Mauch Chunk, 2 Cir., 1907, 154 F. 182, 186, is peculiarly applicable: "We think the books will be searched in vain for an authority holding a vessel blameless under the starboard hand rule when it appears from her own admission that her navigators did not see the burdened vessel or hear her signals until she was about 300 feet distant." (This was during the day and whistles were blown).

In the case from which I have quoted, the majority of the court held that the rule of special circumstances was applicable, and that both vessels were at fault. I analyse the situation at bar the same way. Even though in that case both of the craft involved were ferryboats, I think the decision is significant here, and that even where the other vessel is not under any special privilege or immunity, a ferryboat is obviously not entitled to a one-sided application of the starboard side hand rule, nor to dispense with lookouts when leaving the slip at night.

My conclusion is that both vessels were at fault. Cardinal, because she was navigating too close to the pier head, and Tremont, because she maintained no lookout and veered sharply across the slip, probably in the interest of saving time on her voyage.

An appropriate decree should be entered in favor of the libelant. I have filed findings.