## CASCO BAY LINES v. THE LAURA.
### No. 28.

District Court, D. Maine, S. D.
April 29, 1948.

Philip G. Willard, of Portland, Me., for libelant.

Philip F. Thorne, of Portland, Me., for claimant.

CLIFFORD, District Judge.

This is a suit in Admiralty brought by the owners of the passenger steamship Maquoit to recover damages sustained by The Maquoit on the morning of August 11, 1945, as a result of a collision claimed to have been caused by the negligence of the scow Laura in Portland Harbor, Maine. The sole issues to be determined are whether both vessels were at fault or only one.

In the course of trial, the Court recessed in order to view that part of the harbor and the piers, the area where the collision occurred.

The Maquoit is a passenger steamer, eighty-five feet in length, ten feet draft, with a gross tonnage of one hundred and fifteen. Her maximum speed is around eight knots. Her crew, on the day of the

collision, consisted of seven men, the Captain, a quartermaster, a fireman, an engineer, and three deckhands. Her pilot house is approximately one-third of the length of the ship from the bow.

The scow or lighter Laura is a self-propelled wooden vessel, fifty feet in length, eighteen feet in width, with a gross tonnage of thirty-one tons. Her engine plant consists of two twin thirty horsepower engines; the entrance to the engine room being a small deck structure near the stern of the vessel, ten or twelve feet forward of the wheel. Her maximum speed is between five and six knots. On her forward deck stands a mast and rigging for the handling of cargo. Her crew on the day of the collision included the Captain; a laborer, detailed as engineer, who was employed by the Portland Water District, a stranger to these proceedings; and a passenger detailed to serve as forward lookout.

The locus of the collision was a point in Portland Harbor, about seventy-five feet southerly of the end of a line of piers extending out into the harbor from the area adjacent to Commercial Street in Portland.

Prior to the collision, The Maquoit had, between 7:30 and 8:00 in the morning, been coaling up at a pier belonging to the A. R. Wright Company, her starboard to the pier end. After coaling her starboard side, The Maquoit proceeded in a general westerly direction, roughly parallel with the line of docks on the northerly shore of the harbor, farther up the harbor toward the Portland-South Portland bridge, preparatory to making a half-circle turn and returning to the same A. R. Wright wharf, so that the port side would be to the pier end ready to take on additional coal.

About the same time, The Laura, having been berthed, as was her custom, on the westerly side of the slip between Winslow's wharf and Deake's wharf, about one hundred and twenty-five feet from the southerly end of these wharves, cast off and got under way, her objective being to transport some workers of the Portland Water District to a nearby island in Casco Bay. On Deake's wharf, lying next easterly of Winslow's wharf, were a set of buildings used as warehouses and extending practically the entire length of the wharf. These buildings obscured a view of the harbor easterly for any craft which might be emerging from the slip and, likewise, obscured the view of activity in the slip for any vessel going in a westerly direction toward the Deake and Winslow wharves.

The A. R. Wright wharf is located several hundred yards easterly of the opening of the slip between Deake's and Winslow's wharves, and juts out into the harbor well over a hundred feet beyond the latter two wharves. The testimony from all witnesses is in agreement that the collision occurred about seventy-five feet beyond the southerly mouth of the slip between Deake's and Winslow's wharves, the bow of The Maquoit and the port side aft of The Laura coming in contact under such circumstances that no substantial shock was felt on either vessel and no damage was done to The Laura other than a possible marring of paint. The air was clear, the day bright, the water calm.

The parties are in accord in regard to weather conditions, the point of impact, failure to experience any appreciable shock of collision by either vessel, and the extent of damage to the scow, Laura. The remainder of the testimony is in sharp conflict.

Libellant's testimony was substantially that The Maquoit proceeded from the A. R. Wright wharf at a speed not greater than four knots; that she followed a course parallel to the docks, at a distance of from fifty to seventy-five feet in order to avoid Naval vessels in midstream and to allow enough room to make a half-circle turn to port without encountering mud flats on the southerly side of the harbor; that the Captain was on the starboard side of the wheel in the pilot house, the quartermaster being on the port side of the wheel; that when about half way between the A. R. Wright wharf and Deake's wharf, The Maquoit's Captain saw, off the starboard bow, over the top of the buildings on Deake's wharf, the mast of what proved to be The Laura coming "very fast", about two or three hundred yards ahead, and

fifty to seventy-five feet in from the southerly end of the slip; that The Maquoit's Captain, fearing a collision, immediately rang three bells and a jingle, the signal for full speed astern, blew upon The Maquoit's whistle several short blasts, and had the wheel thrown hard to port; that The Maquoit thereupon slackened her speed and at the time of the collision was either absolutely or almost dead in the water; that The Laura emerged straight from the slip with a speed of four or five knots, having no forward lookout; that The Laura did not change her course or speed and did not blow any whistles, at any time, or at least that no whistles were heard; that The Laura thereupon collided with The Maquoit, scuffing or scraping across her bow, without any damage to The Laura, but bending five feet of the stem of The Maquoit to port, twisting the bolts holding the stem plate to the deadwood, so that at full speed leaks developed around the bolts; and that both vessels proceeded on their way, after a brief interchange of conversation.

Claimant's testimony was substantially that after warming up her engines and casting off, she began to move out of the slip and blew one long blast of her whistle from six to ten seconds in duration; that one Lawson, a passenger, was stationed as bow lookout, one Hines, a laborer, was tending the engines, and the Captain was at the wheel, aft; that at the end of the slip The Laura had attained a speed of less than two knots; that as the bow of The Laura was emerging from the slip, between Deake's and Winslow's wharves, Lawson saw The Maquoit, shouted and waved a hand signal to the Captain of The Laura; that immediately thereafter The Laura's Captain told engineer Hines to reverse the starboard engine and put the port engine in neutral, while he himself threw the wheel to starboard; that Hines immediately obeyed the Captain's orders; that by the time of the collision, seventy-five feet further out into the harbor, The Laura's bow had swung slightly or "a hair" to starboard; that The Maquoit, when first sighted by Lawson, was about one hundred feet away and seventy-five or eighty-feet out from the piers; that The Maquoit speed was too fast, her course and speed were not observed to change, and her whistle was not heard at any time; and that no one was seen forward on The Maquoit but that her Captain was seen to come on deck just before the collision and that only a young man with dungarees was seen in the pilot house.

The undisputed facts concerning the maneuvering of The Laura are that in a distance of about seventy-five feet this fifty foot vessel, equipped with two thirty horsepower engines, managed to turn its bow to starboard only "a hair" or, at the most, thirty degrees, both these expressions having been used in testimony by the Captain of The Laura, and that the measures taken to effect this turn were putting the port engine in neutral and reversing the starboard engine. In view of the sudden danger confronting the two vessels, it is nowhere contended that The Laura's action in attempting to turn was ill-advised. The chief contention of the libellant is that this turning maneuver was not performed as effectively as it could have been had the port engine been put on full forward speed while the starboard engine was reversed at full speed.

This contention finds support in the testimony of one of claimant's witnesses, Mr. Lawson, a man of twelve years' experience in the Merchant Marine, and former Coast Guard instructor in seamanship. He testified, under cross examination, that the scow could turn in its own length if one engine pushed and the other pulled, but would not turn so quickly if one engine pulled while the other was in neutral.

■ It is not necessary to determine whether the failure to utilize both engines to accomplish a quick turn was attributable to The Laura's Captain or to the engineer. The simple fact is that the engines were not so used and therein lies The Laura's negligence.

■ The scow Laura claims she was proceeding slowly out of the slip and had sounded the proper signal shortly after casting off from her berth. Whether she was proceeding slowly, and had sounded the long blast of her whistle as she asserts or was proceeding fast without sound-

ing any whistle as claimed by The Maquoit, this Court feels is wholly immaterial because she saw or could have seen the approaching Maquoit in a position of apparent danger in time to have avoided a collision with her by the exercise of reasonable prudence on her part.

The Master of the scow Laura should have known from his long experience piloting vessels in Portland Harbor, that vessels, at times, pass nearer the pier ends than they ought to pass, and should have had this fact in mind when he cast off from his berth in the slip.

The Laura fails to give any sound reason for her failure to avoid the collision. Her passenger lookout states that he saw The Maquoit some distance easterly, while looking through the piers supporting Deake's wharf as she was about to enter the harbor from her slip; that he signalled the Master, at the wheel, of the approach of The Maquoit and the Master states that he signalled the engineer to reverse the starboard engine and put the port engine in neutral, and that his orders were obeyed immediately. The Court is, however, unconvinced that the orders or signals allegedly given by the Master regarding the operation of the engines were carried out. The engineer of The Laura, a laborer, and an employee of the Portland Water District, testified on direct examination as follows:

"Q. As you proceeded out, I ask you whether or not you received any signal from Mr. Whitney?" (The Master who was at the wheel at that time) A. No.

"Q. Did he tell you to do anything with reference to the engines? A. *Not until after we had the accident.* (Emphasis supplied by the Court.)

"Q. After we had the accident? A. Before we had the accident."

On cross examination this same witness, the engineer, testifies as follows:

"Q. What would be the effect on going ahead with the port engine and in reverse with the starboard engine? A. —Well, going ahead with the port engine, you would have to throw it over to starboard with your starboard engine in reverse.

"Q. I am not sure I understand the answer. Do you want to say it again? A. I say, that if you are going ahead and you throw out your port engine, and put your starboard engine in reverse which would throw your starboard side over hard.

"Q. That would throw it over as hard as it could be thrown? A. Yes.

"Q. Would it add to this effect any if you drove ahead with the port engine at the same time you were reversing with the starboard engine? A. I wouldn't know."

Shortly thereafter the following questions and answers were further given on cross examination:

"Q. You have acted as engine room man on vessels? A. Yes, just to help out Mr. Whitney.

"Q. Just to help out Mr. Whitney. You don't think keeping the port engine going ahead would have turned the vessel any quicker? A. Well, I am no sea-faring man, so I wouldn't know anything about that."

■ Testimony was given by the Captain and members of the crew of The Maquoit that there was no alteration or change in either the course of The Laura or in her speed from the time they first saw her mast until after the collision occurred, and the Court is of the opinion that the weight of the evidence sustains this contention. The Court also feels that the evidence amply warrants the conclusion that the engineer was both inexperienced and incompetent. From his testimony and his appearance on the witness stand it was apparent that he was unlikely to comprehend and put into effect any instructions or signals that might have been given to him by the Captain prior to the collision.

■ An additional fact, apparent from the testimony, is that The Laura's slip whistle was sounded, shortly after casting off her lines, for a period of six to ten seconds. Equally apparent is the fact that the whistle did not continue to blow until The Laura cleared the slip's opening. In failing to continue her signal until she passed beyond the wharves on either side of the slip, The Laura violated a duty established by many cases. The Supply No. 4, 2 Cir., 109 F.2d 101.

The Court, while not relying on this act of negligence, feels it is indicative of the general level of prudence observed by those on The Laura on the occasion in question.

The claimant invokes the "starboard hand" rule, Article 19 of the Inland Regulations, 33 U.S.C.A. § 204, which states: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

However, the "special circumstances" rule, Article 27 of the Inland Regulations, 33 U.S.C.A. § 212 states: "In obeying and construing these rules due regard should be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

In a case with remarkably similar facts, The John I. Clark, D.C., 199 F. 981, at page 983, it was said: "The paramount duty imposed upon vessels in close proximity to each other, and particularly in waters like those at the scene of this accident, (i. e., a juncture of slip opening and harbor) is to avoid the risk of collision, and for failure so to do reliance cannot be had on the ordinary rules of navigation to avoid responsibility." (Parentheses by the Court.)

█ The meeting of the vessels was unexpected and in close proximity. The Court is, therefore, of the opinion that the rule of special circumstances is applicable and that liability cannot be based on any breach of duty to keep out of the way on the part of an alleged burdened vessel.

In regard to The Maquoit, if there is any fact uncontradicted in the evidence, it is that The Maquoit, starting from the A. R. Wright wharf, well over one hundred feet into the harbor beyond the ends of the Deake and Winslow wharves, collided with The Laura at a point about seventy-five feet off the end of those wharves. In other words, The Maquoit followed a course bearing slightly toward the docks, diminishing her distance from them by at least twenty-five feet. The Captain of The Maquoit certainly was well acquainted with the large number of small vessels berthed in the series of slips to the starboard of The Maquoit's course. He, himself, testified that he knew The Laura berthed at Winslow's wharf and that he was certain that the mast sighted by him was The Laura's. He knew or should have known that there was a strong possibility of some scow, lighter, smack, barge, or other small vessel emerging from one of the several slips. And he, of course, above all others, knew the difficulties of maneuvering and stopping a vessel as relatively large and cumbersome as The Maquoit in the area adjacent to the docks in time to avoid collision.

It is possible that the presence of Naval vessels farther out in the stream and flats on the far side of the harbor made a course near the docks most convenient for The Maquoit. Something more than mere convenience, however, is demanded by the standard of reasonable care.

█ The authorities amply illustrate the duty of a relatively large vessel to refrain from steaming at too close a proximity to pierheads. The Ralphie B., D.C., 64 F. Supp. 299; The Fanwood, D.C., 61 F. 523; The John I. Clark, 199 F. 981; The James P. McGuirl, D.C., 225 F. 662; The Supply No. 4, 2 Cir., 109 F.2d 101.

█ It is the opinion of the Court, and it so finds, that The Maquoit was proceeding in too close proximity to the pierheads just prior to, and at the time of collision, and was at fault in this regard.

However, the Court finds that in other respects The Maquoit was not at fault, but, on the contrary, her Captain and crew acted with all dispatch in minimizing the danger once it had become obvious. Those on The Maquoit did not see and could not see The Laura until the time when her Captain sighted her moving mast over the buildings on Deake's wharf, at which time all practical means were promptly used to stop the forward motion of The Maquoit.

The statement of The Maquoit's Captain that she was practically dead in the water is borne out by the almost total absence of damage to The Laura and the absence of any appreciable shock of collision, a fact

agreed to by all of the witnesses. Even slight headway on the part of a one hundred and fifteen ton vessel with stem sheathed in iron plate would have inflicted considerable damage and shock on a wooden vessel of thirty-one tons. Contrary observations on the part of claimant's witnesses are not convincing in view of the consequences of the collision to both vessels.

This Court finds that both vessels were equally at fault, The Maquoit because it was navigating too close to the pierheads, and The Laura because it did not take all available and feasible measures to avoid an impending collision when it was practical to do so, and that they were both at fault in these regards.

The damages shall, therefore, be divided between the vessels, and a decree to that end will be entered.