**UNITED OVERSEAS EXPORT LINES, INC., Plaintiff-Counter Defendant-Appellee, Cross-Appellant,**

v.

**MEDLUCK COMPANIA MAVIERA, S.A., in personam, Defendant,**

**M/V MEDJOY, her engines, tackle, apparel, furniture, etc., in rem, et al., Defendants-Counter Plaintiffs-Appellants Cross-Appellees.**

No. 84–3587.

United States Court of Appeals, Fifth Circuit.

April 2, 1986.

Robert J. Barbier, Terriberry, Carroll & Yancey, Andrew T. Martinez, New Orleans, La., for defendants-counter plaintiffs-appellants cross-appellees.

T. Gregory Serwich, II, Phelps, Dunbar, Marks, Claverie & Sims, Charles E. Dunbar, III, New Orleans, La., for plaintiff-counter defendant-appellee, cross-appellant.

Before GOLDBERG, HILL, and JONES, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

In the very early morning hours of June 14, 1977, two large ships collided in a small harbor on the western coast of Central America. The owners of the two ships

appeal the decisions of the district court that apportioned the relative negligence of each ship and assessed damages. Finding no error by the district court, we affirm in all respects.

### I.

We initially summarize the circumstances of the collision as determined by the district court. *See* 513 F.Supp. 273 (E.D. La.1981). Although these circumstances were hotly disputed at trial, the parties now challenge only one key factual finding, which will be discussed in Part II of this opinion. Otherwise, we accept the unchallenged factual findings as made.

United Overseas Export Lines, Inc. ("United Overseas") owned the M/V Oriental Ruler. The Oriental Ruler was a combination oceangoing cargo/passenger vessel of approximately 8,000 gross tons. She was built in 1954 and flew the Liberian flag. Although she continued to trade for several months after the collision, she was sold for scrap in December 1978. Stanic Compania Naviera, S.A. ("Stanic") owns the M/V Medjoy.[1] The Medjoy is a cargo vessel of approximately 3,700 gross tons. She was built in 1957 and flies the Greek flag.

On June 12, 1977, the Medjoy arrived in the port of Cutuco, El Salvador, which is on La Union Bay in the Gulf of Fonseca. The port's only dock runs on an east-west line extending eastward into the bay. The Medjoy initially went to anchor at a position somewhat to the north of the dock and began loading her cargo from barges. She then proceeded to the dock, and by the afternoon of June 13 she was secured on her port side to the dock's offshore (north) side with her bow facing inland.

The Oriental Ruler arrived at the port on June 13 and went to anchor, paying out three shackles of chain, at approximately the same position the Medjoy had occupied the day before. The Oriental Ruler was stationary at this point, approximately 500 yards north of the dock, although the evidence did not indicate her exact position.

A port pilot boarded the Medjoy at about 1:30 a.m. on June 14 to take her from the port. After slipping her lines at 1:50, she backed slowly down the dock. She cleared the open end of the dock at 1:55, and she swung her stern to port, leaving the ship facing the northeast. She then put her engine half ahead and her rudder hard to starboard to turn toward the Cutuco channel.

As the Medjoy proceeded ahead after clearing the dock, the Oriental Ruler began the process of coming to the berth vacated by the Medjoy. The Oriental Ruler was moving toward the dock at a very slow rate of speed; the Medjoy was on its hard starboard course at a speed of five to six knots.

When the Medjoy went into her turn, her master first observed the green starboard light of the Oriental Ruler. The master then ordered a last minute change of course, very shortly before the collision occurred, to turn hard to port and ordered the engines full ahead. Just before impact, the master of the Oriental Ruler ordered her engine half astern and then full astern, but she did not have time to respond. At approximately 2:00 a.m., the bow of the Oriental Ruler struck the Medjoy on her port side.

After the collision, the two vessels remained locked together for about two hours. When they finally drifted or maneuvered free, the Medjoy went to anchorage and the Oriental Ruler proceeded to the dock where she tied off. The Medjoy sustained damage to her port side in the area of her number three hatch, and the Oriental Ruler sustained damage to her bow.

United Overseas sued, and at trial the district court determined that both vessels were at fault. The court found that the Medjoy had committed several errors in navigation that caused the collision: (1) she maintained an improper lookout; (2) she

---

**1.** Originally, Medluck Compania Naviera, S.A., the vessel's general agent, was sued as owner of the Medjoy, but Stanic was substituted as the proper party.

failed to make a plot of the position of the Oriental Ruler and navigated too close to her position; (3) she failed to stop or reverse when the danger of collision was apparent; and (4) she made the collision more likely by at the last moment ordering hard to port full ahead, into the path of the Oriental Ruler.

The court found that the Oriental Ruler also had committed errors in navigation which caused the collision: (1) she failed to hold her position and wait for the Medjoy to clear the channel and (2) being situated on the Medjoy's starboard hand and then failing to yield, she violated a rule of navigation. The court found that the greater fault lay with the Medjoy, however, and apportioned liability on the basis that the Medjoy was 65% at fault and the Oriental Ruler 35% at fault.

The district court referred the damages issues to the magistrate. Modifying and adopting the magistrate's report, the court found that United Overseas sustained $80,-405.90 in damages to the Oriental Ruler and that Stanic sustained $168,754.59 in damages to the Medjoy. After reducing each figure by an amount reflecting the respective ships' degrees of fault, the court entered judgment in favor of each party for its respective damages. Both parties appealed.

## II.

We initially address the district court's determination of the relative fault of the vessels. United Overseas and Stanic each claim that the vessel of the other was solely at fault in causing the collision. The allocation of fault in maritime collision cases by a trial court, as with other questions of fact, will be set aside only if clearly erroneous. *See Inland Oil and Transport Co. v. Ark-White Towing,* 696 F.2d 321, 325 (5th Cir.1983); *Gele v. Wilson,* 616 F.2d 146, 147–48 (5th Cir.1980). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gyp-*

*sum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed.2d 746, 766 (1948).

United Overseas first argues that the district court erred in finding that the Oriental Ruler was underway and proceeding to the dock prior to the collision. United Overseas cites entries in the bell books of the Oriental Ruler and the testimony of those in charge of her navigation for the proposition that she was at anchor with her engines on standby while the Medjoy was maneuvering. According to United Overseas, since the Oriental Ruler was properly at anchor, the Medjoy, as the moving vessel, was entirely at fault.

Other evidence refuted United Overseas' contention, however, and tended to establish that the Oriental Ruler was navigating prior to the collision. Her master, second mate, and third mate all testified that she had on her navigation lights before the Medjoy arrived. Further, Stanic's expert witness testified that the nature of the damage to the Medjoy—a puncture on her port side—indicated that the Oriental Ruler was underway when the collision occurred. According to the expert, if the Oriental Ruler had been motionless the damage to the Medjoy would have been more superficial and no puncture would have occurred. Finally, the expert indicated that the Oriental Ruler must have been navigating because the ebbing tide at the time of the collision would have caused a ship at anchor to head into the tide in a northwesterly direction; the parties agree that the Oriental Ruler was not on such a heading but was aligned instead toward the dock and the Medjoy. In light of this evidence we are not left with the definite and firm conviction of error necessary to reject the district court's finding that the Oriental Ruler was underway at the time of the collision.

United Overseas next contends that the district court misapplied the starboard hand rule in ascribing fault to the Oriental Ruler. This rule provides that when two power-driven vessels are on a crossing course, "the vessel which has the other on her own starboard side shall keep out of

the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel." International Regulations for Preventing Collisions at Sea, 1972, 33 U.S.C. foll. § 1602 ["International Regulations"], Rule 15. United Overseas does not challenge the finding that the Oriental Ruler had the Medjoy on her starboard hand, but argues instead that the special circumstances of the situation permitted a departure from the starboard hand rule. Rule 2(b) of the International Regulations provides "In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger."

United Overseas first argues that two vessels on a starboard-to-starboard passing course create a special circumstance in which the starboard hand rule does not apply. *See Mystic Steamship Corp. v. M/S Antonio Ferraz,* 498 F.2d 538, 543–44 (2d Cir.1974); *The Arfeld,* 42 F.2d 745, 748 (E.D.La.1930). However, the evidence indicates that the two ships were not on a clear starboard-to-starboard passing course. If the vessels were ever aligned starboard-to-starboard, it was only a momentary alignment during the Medjoy's continuous course away from the dock and then starboard on a sharp turn to leave the bay. The vessels were never on the continuous parallel course which was the circumstance in both *Mystic* and *Arfeld,* and they held a starboard-to-starboard heading for far less time.

United Overseas' second argument that special circumstances negated the starboard hand rule is of greater weight. According to this contention, vessels maneuvering to and from an anchorage constitute a special circumstance. Since the Oriental Ruler was either at anchorage or just leaving an anchorage, and the Medjoy was leaving the dock, the argument runs, the Oriental Ruler cannot be held at fault merely for being situated on the Medjoy's starboard hand.

■ A long established principle of admiralty law holds that where a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course, the ordinary steering and sailing rules may not apply. *E.g. The Transfer No. 18,* 74 F.2d 256, 257 (2d Cir.1934); *City of New York v. Morania No. 12, Inc.,* 357 F.Supp. 234, 240 (S.D.N.Y.1973). One authority has stated that special circumstances exist when "[v]essels ... [are] maneuvering into position alongside piers...." G. Gilmore & C. Black, *The Law of Admiralty* § 7–11 at 509 (2d ed. 1975). Courts have applied the special circumstances rule where a vessel was navigating to her anchorage ground, *e.g., The Isaac T. Mann.,* 63 F.Supp. 339, 341 (S.D.N.Y.1945), and where vessels have unexpectedly met in close proximity near the opening of a slip. *E.g., Casco Bay Lines v. The Laura,* 78 F.Supp. 269, 273 (D.Me.1948).

■ While the district court's application of the starboard hand rule here is subject to question,[2] we need not hold that it was clearly erroneous, for the court attributed fault to the Oriental Ruler for the same actions on an alternate theory. The actions of moving slowly forward before the Medjoy had cleared the way were found to be at once both a violation of the starboard hand rule and an unsafe failure to hold her position. The latter was faulty, according to the court, because the collision could have been avoided if the Oriental Ruler "had waited just a few minutes longer for Medjoy to clear the channel as she was obviously putting to sea." 513 F.Supp. at 275. The court analogized the situation to one where a motorist is "inching" into an

---

2. We note, however, that many of the cases cited in the preceding paragraph involved collisions in a crowded New York harbor, and the nature of a special circumstance may differ in the remote, uncrowded, one-dock harbor of La Union. Moreover, there is a point where a vessel has proceeded far enough from a dock so as to permit application of the usual steering and sailing rules. *See Pitney v. United States,* 149 F.2d 907, 908 (2d Cir.1945) (starboard hand rule applies to crossing of ferryboat and steamlighter 900–1000 feet off the pierhead line).

intersection while another motorist is going through the intersection without a proper lookout. *Id.*

The navigation rules "are not a complete and comprehensive code of navigation, compliance with which is sufficient to avoid liability, but ..., on the contrary, the ordinary precautions of good seamanship, as defined by custom and case law, are still required." G. Gilmore & C. Black, *supra,* § 7–11 at 509; *see also* International Regulations, Rule 2(b). The district court, in effect, found that the Oriental Ruler violated the duty imposed by ordinary good seamanship to wait for the Medjoy to clear the dock area before proceeding to the same berth. Such a duty is independent of any other duty to abide by the steering and sailing rules. Thus, we are unable to conclude that the district court clearly erred in ascribing fault to the Oriental Ruler's approach of the dock area.

United Overseas next argues that the district judge erred in not attributing fault to the Medjoy for her failure to indicate her hard starboard turn by a signal on her whistle. Rule 34(a) of the International Regulations provides in part: "When vessels are in sight of one another, a power-driven vessel underway, when maneuvering as authorized or required by these Rules, shall indicate that maneuver by the following signals on her whistle: One short blast to mean 'I am altering my course to starboard....'" The district court listed several instances of the Medjoy's fault, but did not include any mention of a failure to signal her turn.

■ When a vessel at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, the burden rests upon her to show that her fault not only was not, but could not have been, the cause of the collision. *The Steamship Pennsylvania v. Troop,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148, 151 (1874). The

*Pennsylvania* doctrine shifts the burden of proof as to causation to the statutory offender, but it does not by itself impose liability. *Otto Candies, Inc. v. M/V Madeline D,* 721 F.2d 1034, 1036 (5th Cir.1983). The statutory violator then may rebut this presumption of liability with evidence showing that the violation could not have been a contributing cause of the collision. *See Florida East Coast Railway Co. v. Revilo Corp.,* 637 F.2d 1060, 1065–66 (5th Cir.1981).

■ We are not left with a definite and firm conviction that the district court erred in its implicit finding [3] that the Medjoy's failure to signal a turn could not have been a cause of the collision. *See Stuyvesant Insurance Co. v. Steamship Esso Tampa,* 286 F.Supp. 730, 737 (E.D.La.1968) (failure to sound whistle not faulty, even if required by navigational rules, where doing so "would have served no useful purpose"). She was in clear view of the Oriental Ruler, the distance between them was not great, and she was on a normal course from the dock to the channel. When the danger of collision became apparent, the Oriental Ruler made an unsuccessful attempt to lessen the impact by ordering its engines astern. The master of Oriental Ruler did not testify that the lack of a signal confused or misled him in any way. In short, the trial court was correct in finding that the fault lay in the Medjoy's being unaware of the Oriental Ruler—which could not have been remedied by a blast from the Medjoy's whistle—rather than the Oriental Ruler being unaware of the Medjoy.

United Overseas' final argument on liability is that the district court erred by not making an adverse inference from Stanic's failure to call as a witness the Medjoy's port pilot. United Overseas cites cases in which a trial court has made inferences about the circumstances of a collision based in part on a party's failure to call an important witness. *See Barrios Brothers,*

---

**3.** A district court is not required to assert the negative of each rejected contention as well as the affirmative of those he finds to be correct. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2579 at 712 (1971). Thus, a trial court is not required to list every factor which was *not* a cause of the collision. By listing all the factors that were the causes, and then not mentioning failure to signal, the court's determination was plain.

*Inc. v. Lake Tankers Corp.*, 188 F.Supp. 300, 303 (E.D.La.1960) (failure to call a member of tugboat's crew, in light of testimony of three witnesses that they did not hear tug's fog signal, raised inference that no fog signal was sounded), *aff'd sub nom. National Marine Service, Inc. v. Barrios Brothers, Inc.*, 286 F.2d 573 (5th Cir.1961); *Landi v. S.S.M.J. Derby II*, 194 F.Supp. 353, 360 (S.D.N.Y.1960) (unexplained failure to call anyone involved in navigation of vessel permits unfavorable inference concerning its navigation); *Lykes Brothers Steamship Co. v. The Tug A.W. Whiteman*, 138 F.Supp. 725, 726 (E.D.La.1956) (failure to call tugboat's engineer, on disputed issue of whether tug was moving ahead or astern, gives rise to inference adverse to tug). We find this contention to be without merit.

■ United Overseas does not point to any still-disputed fact issue upon which the absent Medjoy's pilot's testimony would bear. The only remaining factual dispute about the navigation of the vessels concerned the district court's finding that the Oriental Ruler was underway and not at anchor. United Overseas does not indicate how the Medjoy's pilot would be in a better position to view the Oriental Ruler's movements than the other witnesses who testified. Moreover, her master and second mate both testified, and the district court apparently determined that there was no reason to believe that the Medjoy's pilot would testify differently. We cannot hold that the district court erred under these circumstances.

■ Stanic claims that the district court erred in finding that the Medjoy maintained an inadequate lookout. However, two factors indicated the lookout's inadequacy. First, he was stationed at the bow, although the Medjoy left the dock by first proceeding astern. "[C]ircumstances un-

der which a vessel must keep a lookout astern ... include movements of the vessel in that direction and, where appropriate, actions which are likely to imperil the safety or encumber the navigation of vessels known to be astern." *Ellis Towing & Transportation Co. v. Socony Mobil Oil Co., Inc.*, 292 F.2d 91, 95 (5th Cir.1961). A lookout at the stern could well have spotted the Oriental Ruler before the Medjoy reversed her engine and proceeded forward toward the eventual collision. Second, the bow lookout admitted that his duties also included untying lines as the aft of the Medjoy cleared the dock. A lookout must have no other duties to perform, for he must not be distracted from his duty to concentrate his attention exclusively on maintaining a proper lookout. *See Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 715–16 (S.D.N.Y. 1977).

We thus reject both parties' assertions that the vessel of the other was solely at fault. The district court found each vessel to have committed serious navigational errors and properly allocated the liability of each vessel proportionately to the degree of her fault. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251, 262 (1975). We recognize that "the calibration of culpability simply is not susceptible to any real precision." *Gele v. Wilson*, 616 F.2d 146, 148 (5th Cir.1980). However, considering the circumstances, a 65%/35% division of fault was not clearly erroneous.

### III.

Two significant damages issues are still contested.[4] First, Stanic contends that the district court erred in allowing an award for damage to the Oriental Ruler when that damage was never repaired. Although temporary repairs were made on the Orien-

---

**4.** We have examined several other damages issues raised by the parties, many involving relatively small amounts (e.g., Stanic claims that the Medjoy incurred costs greater than that allowed, including $8.68 for fuel and $.90 for wages during temporary repairs), and we find no reversible error in the district court's resolution of these issues.

tal Ruler, she was sold for scrap before permanent repairs were undertaken. The largest item of damages in the Oriental Ruler's award was an amount representing a credit for the estimated cost of the unperformed permanent repairs.

 Stanic's position is contrary to the established case law of this court. "Even if repairs are never effected, an injured shipowner is still entitled to recover the estimated cost of repairs therefore." *The Tug June S v. Bordagain Shipping Co.,* 418 F.2d 306, 307 (5th Cir.1969). The fact that the Oriental Ruler was later scrapped does not change this result. Stanic concedes that its contention is inconsistent with the general rule on the recoverability of unrepaired damages, but urges us to reject the rule in this case. Such arguments are more properly directed to this court sitting en banc, for we are not at liberty to alter the law of this circuit until our en banc court or the Supreme Court so instructs us. *United States v. Albert,* 675 F.2d 712, 713 (5th Cir.1982).

 Second, United Overseas claims that the damage award improperly deducted the actual cost of temporary repairs from the estimated cost of permanent repairs to the Oriental Ruler. The magistrate reasoned that the temporary repairs, which included welding plates over the damage to her bow, reduced the amount of necessary permanent repairs, and the district judge agreed. United Overseas cites evidence, as it did below, of the superficial nature of the temporary repairs and the structural nature of the unperformed permanent repairs. However, United Overseas has still been unable to cite any evidence in the record to indicate that the temporary repairs would have been of no value in reducing the cost of permanent repairs. Agreeing with the district court, we do not believe that such an assertion is so obvious as to require no proof.

We therefore AFFIRM the judgment of the district court in all respects.