## THE TRANSFER NO. 18.
### No. 165.

Circuit Court of Appeals, Second Circuit.
Dec. 17, 1934.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for appellant.

Duncan & Mount, of New York City (H. W. Dieck, Jr., and Charles R. Millett, both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The Long Island Railroad Company filed a libel against the steam tug Transfer No. 18, belonging to the New York, New Haven & Hartford Railroad Company, to recover damages caused by the collision of the New Haven's float, which was in tow of Transfer No. 18, with libelant's Car Float No. 16. The District Judge held the libelant solely in fault and dismissed the libel. We think that each party was negligent and that accordingly the damages should be divided.

The libelant's tug Quogue made fast Car Float No. 16 to her starboard side and started to back it out of Bridge 5, Long Island City, in order to tow it through the East River to Greenville, N. J. The car float was 300 feet long and carried 17 loaded cars. The tide was a little past the middle of the ebb, and was running about two and a half miles an hour. There was a fresh northwesterly breeze. When the tide caught the stern of the float, as the Quogue backed her out of the slip, it swung her around bringing her bow toward the west. As soon as the Quogue had thus backed out Car Float No. 16, it was her purpose to swing her around in the tide and finally tow her in a southwesterly direction so as to get her on her course down the East River.

The tug blew a slip whistle as she started to emerge and when about halfway out of the bridge her master saw the New Haven tug Transfer No. 18 coming up the river, carrying on each side a heavily loaded car float about 227 feet long. At the time there was no other craft in the river, and No. 18 was about 1,500 feet below the Quogue and her float and 600 feet from the Long Island shore.

When No. 18 saw the Quogue and her float emerging, the former stopped her engines but was carried ahead with her floats under their momentum and the impulse of the ebb tide. Neither tug blew any passing signals. No. 18 sought to excuse this omission on the ground that she did not know at the time whether the Quogue proposed to go down the river or up the river, or to land her float at an adjacent pier on the east side. However, when No. 18 saw that the Quogue had backed out and was proceeding to swing around in order to go to the southeast and thence down the river, she blew an alarm, put her engines in reverse, and thereafter blew three whistles to show No. 18 that she was backing. This, however, was but a short time before the collision, for her backing had not continued long

enough to swing her float to starboard, though such would be the inevitable tendency of backing. No. 18 made no attempt to go to port, in spite of the fact that the channel was more than 1,200 feet wide at that place, and she therefore had upwards of 600 feet of clear water on the port side within which to navigate. On the contrary, she continued, so far as she still had headway, straight up the river on her original course.

When the Quogue heard the alarm of No. 18, she blew alarms herself but kept on her swing until finally her float got across the channel, with its bow about 600 feet outside the Long Island piers, and its westerly end, on the port side, came in contact with the bow of the starboard float of No. 18 and suffered the damage for which this suit was brought.

The trial judge held the case one of special circumstances and that Inland Rules, art. 27 (33 USCA § 212), accordingly applied. He found the Quogue solely responsible for the collision because she backed out too fast and too far and did not hold her tow up in the tideway so as to let No. 18 and her floats pass on their way.

There can be no doubt that the case here was one of special circumstances. We have frequently held that, where a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course, and a tow is going up or down the river, the "ordinary steering and sailing rules and signals made for vessels navigating on definite courses" do not apply, but each vessel must proceed with "due regard * * * to all dangers of navigation and collision." The Cherokee (C. C. A.) 70 F.(2d) 316, 317; The New York Central No. 3 (C. C. A.) 42 F.(2d) 207; The Socony No. 19 (C. C. A.) 24 F.(2d) 653, 654; The El Valle (C. C. A.) 25 F.(2d) 619; The William A. Jamison (C. C. A.) 241 F. 950; The Washington (C. C. A.) 241 F. 952; The John Rugge (C. C. A.) 234 F. 861.

The master of the No. 18 was aware that the Quogue was swinging her float in an arc having a radius that was bound to bring the outer end of the float directly in the course of the tow No. 18. There was ample room in the channel to the west of the field in which the Quogue was maneuvering and the New Haven tow could readily pass to the port of the Quogue and her float without risk to the latter. The master of No. 18 seems, indeed, to have thought that such a passage was practicable. Instead, however, of either reversing and stopping his headway when he saw the Quogue and her loaded tow backing into an ebb tide where he should have known that she might swing out near the center of the channel, or blowing one whistle and proceeding to port, he allowed his flotilla to be carried forward in the ebb tide, until it became too late by reversing to prevent a collision.

It may be said that No. 18 could not ascertain what the maneuver of the Quogue was to be until too late to avoid the collision, and apparently the trial judge thought that she did all she could and did it in season. But we believe the fact to be that she did not begin to reverse soon enough safely to avoid the on-coming tow of the Quogue provided the latter continued to swing so as to get in a position to go down the stream. The backing of No. 18 naturally tended to turn her tow to starboard and she would not have remained on her original course, as she seems to have done, if the backing had not begun a very short time before the collision. Apparently No. 18 waited until the car float of the Quogue was so near that a collision could not be averted by backing. No. 18 should either have reversed sooner, so that the Quogue and her tow might pass across her bow, or else should have gone to port and up the river to the westward of the Quogue's float. The navigation of No. 18 seems to have been plainly negligent, and we think the District Court erred in holding her free from fault.

But the Quogue was likewise at fault. When she saw No. 18 coming up the river with two car floats, and undertook a maneuver which was bound to bring her own float far out into the stream, she should have realized that the course of No. 18 and its tow, if continued, would cross her own and that the Quogue should have held back or at least have given to No. 18 a passing signal definitely indicating to the latter which side of the channel ought to be taken. It seems reasonably clear (and so the District Court found) that the Quogue could and should have held her tow up in the tide so that it would not extend far out into the river and would have been under her control, instead of being subjected to the full force of the ebb tide broadside. If she had done this, the No. 18 could have passed safely upon the course which she seemed to insist on maintaining. Her failure to do this and her unnecessarily wide swing across the path of No. 18 involved considerable risk and did not show the "due regard * * * to * * * dangers of navigation and collision" required by prudent seamanship as well as by the rule. Inland Rules, art. 27 (33 USCA § 212).

258

We hold No. 18 liable for insisting on her course and neither holding back nor going to port, and the Quogue liable for not holding back when she saw a heavily loaded tow coming up the river that would soon pass her, or, if she did not do this, for not holding her tow up in the tide, when it seemed reasonably apparent that No. 18 was maintaining her original course, in order that it should not sprawl across the channel. In our opinion, she was likewise negligent in sounding no signal to inform No. 18 on which side the tows were to pass one another. Rule 3 provides that such signals shall be given "at all times, when the vessels are in sight of each other." It is perfectly true that ordinary sailing rules do not apply to a case of "special circumstances," but this does not mean that all signals that will promote safe navigation are to be dispensed with. If the Quogue had blown one whistle and signaled that the floats were to pass port to port, or had not got her car float broadside of the channel, or had waited to emerge finally and completely from her slip until No. 18 and her floats had passed by, there doubtless would have been no accident.

The decree is modified so that the damages will be divided.