The CITY OF NEW YORK, as Owner of the TUG SANITA, Plaintiff,

v.

MORANIA NO. 12, INC., the TUG MORANIA NO. 12, Penn Industries, Inc., and BARGE NO. 79, Defendants.

PENN INDUSTRIES, INC., as Owner of the BARGE NO. 79, Plaintiff,

v.

The CITY OF NEW YORK and The TUG SANITA, Defendants.

Nos. 66 Civil 2576, 66 Civil 4122.

United States District Court,
S. D. New York.

March 28, 1973.

J. Lee Rankin, Corp. Counsel, City of New York, for The City of New York; Wilbur E. Dow, Jr., New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for Morania No. 12, Inc., the Tug Morania No. 12, Penn Industries, Inc., and Barge No. 79; Joseph C. Smith, John F. O'Connell, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

This is an admiralty action involving a collision between a tug, the Sanita, with another tug and barge in tow, the Morania No. 12 and Barge No. 79 respectively. The collision occurred when the Sanita attempted to enter its berth as the Morania No. 12 with the Barge No. 79 in tow was backing out from between two piers.

After hearing the testimony of the parties, examining the exhibits, the pleadings, the Proposed Findings of Fact and Conclusions of Law, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This court has jurisdiction over the subject matter and persons in this action.

2. On the night of September 4, 1965 the tug Sanita was owned and operated by the Department of Sanitation, City of New York. (Stipulation, pretrial order, p. 2.)

3. On the night of September 4, 1965 the tug Morania No. 12 was owned and operated by Tug Morania No. 12, Inc. (Stipulation, pretrial order, p. 3.)

3. On the night of September 4, 1965 the tug Morania No. 12 was owned and operated by Tug Morania No. 12, Inc. (Stipulation, pretrial order, p. 3.)

4. On the night of September 4, 1965 and at all times relevant to this action the Barge No. 79 was owned by Penn Industries, Inc. but was under the direction and control of the tug Morania No. 12 as a tow. (Stipulation, pretrial order, p. 2.)

5. The Sanita was built in 1954. (37.)[1] It was known by her crew to be an unstable tug when she was put into service. (40, 41, 42, 51.) There were subsequent efforts in July of 1965 to correct its instability (45, 47) by placing pig lead spools into its bilge (43), which spools were not made fast (96) but were piled up in a lose manner on the port side midship between the ribs. (95–100.) Additional efforts to correct the Sanita's instability were made by placing concrete blocks on its bow. (42–44.) These efforts to correct the Sanita's instability had only minimum corrective results. (49.)

6. On the night of September 4, 1965 the tug Morania No. 12 with five gravel barges in tow, at or about 10:00 P.M., arrived between piers 69 and 70 on the Manhattan side of the East River. (198–199.) Subsequently, the Morania left four of these barges on the north side of pier 69. (198–204.) Later, at or about 10:40 P.M. the Morania No. 12 commenced backing out from between piers 69 and 70 with the Barge No. 79 strapped in tow to the starboard side of the Morania No. 12. (154.) As the

---

[1] Numbers in parentheses, unless otherwise noted, refer to the stenographic minutes of this trial before this court on November 20 and 21, 1972.

Morania No. 12 proceeded to back out she increased her speed. (187, 207.) She failed to blow a slip whistle or to blow three blasts to signal she was going astern. (187, 207.) [2]

7. At or about 10:40 P.M. on September 4, 1965 the tug Sanita crossed the East River from Newtown Creek and headed for her berth on the outer end of the south side of pier 70 (8, 9; Ex. 1), a Department of Sanitation pier used by the tug Sanita as its berth on the East River. (3, 4; Ex. 1.) The Sanita had all running lights properly displayed as she crossed the East River. (71, 72, 187, 188.)

■ Both the Captain, Leroy Petty, and the lookout, John Kaltner (74, 85) of the Sanita, while crossing the East River, observed two all white aft staff lights on the stern of a tug between piers 69 and 70 on the Manhattan side of the East River (10, 55), signifying a tug with a vessel in tow alongside and underway. (55, 56, 203.) This tug proved to be the Morania No. 12 and Barge No. 79. (8, 75.) However, Captain Petty and lookout Kaltner did not observe any other running lights during their observation of the Morania No. 12. (10, 59, 60, 66.)

9. Neither the captain nor the lookout of the tug Sanita noticed any movement of the tug and tow they observed between piers 69 and 70. (11, 59, 75.) [3] No whistle signals were heard by the captain or the lookout of the Sanita from the tug Morania No. 12. (12, 17, 40, 75.) The Morania No. 12 had in fact never blown any signal whistles. (171, 187, 224.)

10. The Sanita continued to approach her intended berth at the outer end of the south side of pier 70 and attempted to enter her slip while the Morania No. 12 with the Barge No. 79 strapped to her starboard side was attempting to maneuver out from between piers 69 and 70, which was unusually congested. (12–16, 33.) At the time the Sanita was being positioned to enter her slip, the captain and the lookout of the Sanita became aware that the tug Morania No. 12 was backing out with the Barge No. 79 strapped to her starboard side. (17, 76, 207, 226.)

11. When the captain of the Sanita became aware that the Morania No. 12 was backing out he immediately put the Sanita full astern and gave three whistle blasts. (18, 77.) This operation caused the Sanita to take a port list, which was a manifestation of the Sanita's instability. (158, 159, 169, 211, 219.) In addition to the aforesaid list created by putting the Sanita full astern, she was caused to swing around across the stern of the Morania No. 12 and the Barge No. 79. (255.) The resulting contact between the Sanita and the Morania No. 12 swung the Sanita completely across the stern of the Morania No. 12 and the Barge No. 79. (19, 22, 51, 251.)

12. At or about the time the Sanita went full astern two deckhands aboard the Morania No. 12 observed the approaching Sanita (156, 157), and, al-

---

2. 33 U.S.C.A. § 203, Rule V, in its pertinent part states:
   "When steam vessels are moved from their docks or berths, and other boats are liable to pass from any direction toward them, they shall give the same signal as in the case of vessels meeting at a bend, but immediately after clearing the berths so as to be fully in sight they shall be governed by the steering and sailing rules."
   33 U.S.C.A. § 213 states:
   "When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle."

3. 33 U.S.C.A. § 203, Rule III, states:
   "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

though not designated as lookouts,[4] they shouted to the captain of the Morania No. 12 to go ahead on his engines. (160, 172, 177–178, 189, 209, 228.) Although the Morania No. 12's said deckhands had observed the Sanita approaching them (171, 176), neither deckhand warned the captain of the Morania No. 12 of the Sanita's approach until the Sanita and the Morania No. 12 were nearly in contact. (171, 179, 188, 189, 228.)

The captain of the Morania No. 12 never saw the Sanita until the Sanita was right underneath the stern of the Morania No. 12 (206, 207, 222) although he had seen vessels in the East River when he started to back out from between piers 69 and 70. (205.)

Once the Morania No. 12 had been put into full ahead there was some delay in her change from her motion astern to forward motion. (166, 209, 226, 256.)

13. Almost simultaneously with the Morania No. 12 being put into full ahead, the stern of Barge No. 79 came in contact with the Sanita approximately 15 feet from the Sanita's bow on her port side and overrode the Sanita's bulwarks (78, 249) while the stern of the Morania No. 12 came in contact with the stern of the Sanita.

The list of the Sanita increased by the contact of the Barge 79 and the Morania No. 12 with the Sanita. (79, 109, 168, 180–181.)

14. As the Sanita's list increased, the quickwater from the Morania No. 12, created by her being put into full ahead, surged over the bulwarks of the listing Sanita and entered the engine room through the port side engine room doorway due to the fact that the engine room door had been secured in an open position. (23, 53, 79, 80, 145, 210–211.)

15. The Sanita subsequently sank within one or two minutes. (24, 227.)

16. Immediately after the Sanita sank, the captain of the Morania No. 12 released Barge No. 79 in the East River and went out into the river to pick up the members of the Sanita's crew who were still in the East River. (183–184, 213, 227.) After these persons were rescued, the Morania No. 12 resecured the Barge No. 79 to its starboard side as it had been prior to the collision with the Sanita and while attempting to enter back between piers 69 and 70, knowing that the Sanita was sunk in that immediate area, caused the Barge 79 to strike the sunken Sanita. (213.)

17. The Morania No. 12 had no designated lookout, did not blow a slip whistle and did not blow a three blast whistle to signal that it was backing out from between piers 69 and 70. (See Findings of Fact 9, 12.)

18. Prior to the collision the Sanita made no attempt to ascertain the direction of movement of the tug Morania No. 12 and its tow, Barge No. 79, or to take appropriate precautions to prevent its unseaworthy condition of unstability, creating a dangerous or hazardous condition by maneuvering in a congested area.[5]

## DISCUSSION

Liability under admiralty collision law involving statutory violations was considered by the Supreme Court in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). The court, in what is now known as the Pennsylvania Rule, held that, "When * * * a ship

---

4. 33 U.S.C.A. § 221 states:
"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

5. 33 U.S.C.A. § 212 states:
"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

at the time of a collision is in actual violation of a statutory rule intended to prevent collision, it is no more than a reasonable presumption that the fault, if not the sole cause was at least a contributory cause of the disaster." The Pennsylvania, supra, 136. The Supreme Court continued, stating that "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." At page 136.

Upon first impression it would appear that the Morania No. 12, having violated three statutory rules of navigation (Findings of Fact 6, 9, 12, 17), would clearly be liable in this instant action, under the law as stated in *The Pennsylvania*. However, a closer examination and analysis of admiralty law mandates a modification of this first impression.

In The Orion, 26 F.2d 603 (1st Cir. 1928), Judge Hale noted the significance of a lookout. "It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. The lookout is 'both eyes and ears of the ship'; he must be properly stationed on the forward part of the vessel and must be held to a high degree of vigilance in that position. Neither the captain nor the helmsman in the pilot house can be considered to be 'lookouts' within the meaning of the maritime law." At page 605.

An earlier district court decision involving the absence of a lookout also noted that not only is the absence of a lookout a statutory violation but that "a lookout is elementary in navigation and good seamanship, and strict performance of this duty is required, and a failure, especially when other craft are known to be in the vicinity, is culpable negligence." The Kaga Maru, 18 F.2d 295, 298 (N.D.Wash.1927). Continuing, Judge Neterer, quoting the Supreme Court from The Ariadne, 80 U.S. 475, 478, 13 Wall. 475, 20 L.Ed. 542 (1871), said that failure to have a lookout "approaches very nearly the line of reckless navigation."

More specifically, the Second Circuit has held that tug boats towing barges would be at fault for not maintaining a vigilant lookout. The O'Brien Brothers, 258 F. 614, 170 C.C.A. 68 (2d Cir. 1919).

In The President, 1927 A.M.C. 1522 (1927), Judge Bondy of this court held The President solely at fault for both her failure to give a backing signal and failure to have a lookout at her stern, although she had given a slip whistle.

Prior to *The President*, the Second Circuit, in The Hokendaqua, 251 F. 562, 564, 163 C.C.A. 556 (2d Cir. 1918), applied the Pennsylvania Rule to a situation wherein there was no backing signal given, holding that "The May [was] at fault for failing to give the backing signal [citations omitted], which she was clearly obliged to do." The Circuit Court of Appeals continued, noting that the court would not speculate whether such failure contributed to the collision since "it is a violation of the statutory rule, and as such the burden rests upon the May to show that it could not have contributed to the collision." At page 564.

In Supply No. 4, 109 F.2d 101 (2d Cir. 1940), again the Second Circuit Court of Appeals noted that the giving of a slip whistle is required by the Inland Navigation Rules and that such a precaution was particularly necessary because her master had reason to expect that a vessel might be near. (See Finding of Fact 12.) The court continued, citing The Poling Bros. No. 2, 62 F.2d 357 (2d Cir. 1932), holding that "Even without such warning a master is charged with knowledge that vessels at times pass nearer to the pier ends than they ought." Supply No. 4, supra, 109 F.2d 103.

The rule in this circuit has long been that the owner of a ship has the burden of proof with respect to its seaworthiness. The Cullen No. 32, 62 F.2d 68, 69 (2d Cir. 1932).

In addition, a navigator is chargeable with knowledge of the maneuvering capacity of his vessel. He is bound to know the character of his ves-

sel and how she would turn in ordinary conditions. The Silverpalm, 94 F.2d 776 (9th Cir. 1937); Columbia, 29 F. 716 (S.D.N.Y.1887). It is also considered negligence to navigate a vessel deficient in power or in ability to maneuver, without making due allowance for such peculiarities. Albert Dumois, 177 U.S. 240, 253, 20 S.Ct. 595, 44 L.Ed. 751 (1900).

It has also long been settled that if a vessel is approaching another vessel which has disregarded her signals or whose position or movement is uncertain, she is bound to stop until her course can be ascertained for a certainty. The New York, 175 U.S. 187, 20 S. Ct. 67, 44 L.Ed. 126 (1899). It was thus the duty of the captain of the Sanita, when in doubt as to the movement of the Morania No. 12 (Finding of Fact 9) to slow or stop the Sanita's engine under the circumstances which created the doubt and which then confronted him. The New York, supra; The Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751 (1900). Additionally, when a vessel is known to be about to enter or leave a dock, other vessels should keep well clear and avoid embarrassing her maneuvers. Socony No. 19, 24 F.2d 653 (2 Cir. 1928).

Where vessels are maneuvering to get into or out of their dock or slip, the situation of special circumstances exists. Pennsylvania R. Co. v. Palmer et al., The Toledo, 70 F.Supp. 912 (E.D. N.Y.1946); The John Rugge, 234 F. 861, 148 C.C.A. 459 (2d Cir. 1916).

Moreover, the Second Circuit has frequently held that "where a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course, and a tow is going up or down the river, the 'ordinary steering and sailing rules and signals made for vessels navigating on definite courses' do not apply, but each vessel must proceed with 'due regard * * * to all dangers of navigation and collision.'" The Transfer No. 18, 74 F.2d 256, 257 (2d Cir. 1934).

Also noted in *The Transfer,* supra, was that while "ordinary sailing rules do not apply to a case of 'special circumstances,' * * * this does not mean that all signals that will promote safe navigation are to be dispensed with." At page 258.

Thus, the Sanita's attempt to enter her slip under the congested conditions (Finding of Fact 10) and in her unseaworthy condition (Finding of Fact 5) clearly places her within the proscribed actions as stated by this circuit in The Hokendaqua, 251 F. 562, 564, 163 C.C. A. 556 (2d Cir. 1918), wherein Judge Learned Hand found that "such a difficult maneuver, particularly in these narrow waters, would have been clear fault;" or negligence. The Cotopani, 20 F.2d 568 (2d Cir. 1927).

This circuit also has held that an "unnecessarily wide swing across the path of [another vessel] involved considerable risk and did not show the 'due regard * * * to * * * [the] dangers of navigation and collision' as required by prudent seamanship as well as by the rule." The Transfer No. 18, 74 F.2d 256, 257 (2d Cir. 1934).

Although the Supreme Court in establishing The Pennsylvania Rule emphasized the importance of regard to the admiralty regulations and the necessity of enforcing obedience to them, such rules are not inflexible. The Supreme Court noted this in a decision subsequent to *The Pennsylvania,* supra, wherein it was pointed out that the primary purpose of rules of navigation is not to fix arbitrary rights of the road to vessels but, rather, for the safety of life and property. The Sunnyside, 91 U.S. 208, 222, 23 L.Ed. 302 (1875).

Indeed, the Supreme Court three years subsequent to *The Pennsylvania* supra, and *The Sunnyside,* supra, in America, 92 U.S. 432, 438, 23 L.Ed. 724 (1876), stated that "even flagrant fault committed by one of two vessels approaching each other from opposite directions will not excuse the other from adopting every proper precaution to prevent collision."

The First Circuit, almost fifty years after the *America* decision, paraphrased the Supreme Court's holding in *America* by stating that where one vessel has committed a gross fault, such fault does not absolve another, with which it is in danger of colliding, from the use of such precautions to avoid the collision as prudence and good seamanship may dictate. Baltimore, 283 F. 728 (1st Cir. 1922).

The Second Circuit has also refused to hold a party liable solely upon the grounds of the violation of maritime rules. The Progressive, 271 F. 207 (2d Cir. 1921).

■ Thus, the test of liability is not the result which occurred, but is whether the master possessed and exercised a reasonable degree of skill and judgment, such as might fairly be expected of a man of his calling in the circumstances in which he was placed. Garden City, 127 F. 298, 62 C.C.A. 182 (6th Cir. 1904). The test is, could the collision have been prevented by the exercise of ordinary care, caution and maritime skill? Jumna, 149 F. 171, 79 C.C.A. 119 (2d Cir. 1906).

■ Title 33 U.S.C.A. § 409 [6] requires the owner of a wrecked or submerged vessel to mark such "immediately." "Immediately" means within a time reasonable under the circumstances, after knowledge of the wreck. Anna M. Fahy, 153 F. 866 (2d Cir. 1907). The Court of Appeals noted that "Undoubtedly the word ['immediately'] should be construed having in view the circumstances of the particular situation in hand." Anna M. Fahy, supra, 153 F. 867. See also Sullivan v. P. Sanford Ross, Inc., 263 F. 348 (2d Cir. 1920).

■ In consideration of the facts and law in this instant controversy, this court reaches a conclusion similar to that reached in The John Arbuckle, 185

F. 240, 241, 107 C.C.A. 346 (2d Cir. 1911): "It was imprudent navigation on the part of both these boats to be proceeding at the same time, the one in and the other out of this crowded slip. Whichever vessel is in fault for bringing about this state of affairs should be held responsible for all the consequences; both of them should be held if both contributed to produce such conditions."

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and persons in this action.

2. The fair preponderance of the credible evidence has established that the proximate cause of the collision between the Sanita and Morania No. 12 and Barge No. 79 were the statutory violations by the Morania No. 12, the negligent manner of operation and navigation of the Sanita and the Sanita's unseaworthiness.

■ 3. The fair preponderance of the credible evidence has established that the Sanita was not in violation of 33 U.S.C.A. § 409 in failure to be marked after it sank and is not, therefore, solely liable for the damage to Barge No. 79. ⟩

■ 4. Plaintiff and defendant are entitled to an interlocutory judgment which shall provide for determination by a special master of the damages sustained by plaintiff, City of New York, and defendant, Penn Industries, Inc., as owner of Barge No. 79, which damages are to be equally divided between plaintiff and defendant, Morania No. 12.

■ 5. Neither plaintiff nor defendant is entitled to costs.

Settle interlocutory judgment, providing for a special master, promptly upon notice.

---

6. 33 U.S.C.A. § 409 in its pertinent part states:
"Whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night * * *; and the neglect or failure of the said owner so to do shall be unlawful * * *."