**ALAMO CHEMICAL TRANSPOR-
TATION CO.**

v.

**M/V OVERSEAS VALDES, her engines,
furniture, apparel, tackle, etc., in rem,
and Maritime Overseas Co., in person-
am.**

**Civ. A. No. 72–827.**

United States District Court,
E. D. Louisiana.

July 24, 1975.

**1096**

George A. Frilot, III, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for plaintiff.

Cornelius G. Van Dalen, and Francis J. Barry, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for the intervenor, Firestone Tire & Rubber Co.

James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., and Max Taylor, Burke & Parsons, New York City, for defendant, M/V OVERSEAS VALDES and Maritime Overseas Co.

J. Dwight LeBlanc, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for third party defendant, Texas Chemical & Plastics, Inc.

JACK M. GORDON, District Judge:

On March 17, 1972, a collision occurred between the M/V OVERSEAS VALDES and the Tug HARD WORK and its tow, the Barge SUN-CHEM 900. The Alamo Chemical Transportation Company, (hereinafter referred to as Alamo), who was the owner of the Tug HARD WORK, commenced this action, *in rem*, against the M/V OVERSEAS VALDES and *in personam* against the Maritime Overseas Co., (hereinafter referred to as Maritime).

Maritime (the operator of the M/V OVERSEAS VALDES) answered Alamo's complaint and counterclaimed against Alamo, *in personam*, and the Tug HARD WORK, *in rem*. In its counterclaim, Maritime seeks recovery for the damages suffered in the collision by the M/V OVERSEAS VALDES and for recovery over against Alamo if a judgment is rendered in another action against Maritime in favor of Mr. Robert W. Jones, a seaman who was aboard the M/V HARD WORK when the collision occurred. The Firestone Tire & Rubber

Company, which was the owner of the cargo stowed in the Barge SUN-CHEM 900, intervened to recover for the damage to the cargo. Firestone Tire & Rubber Company (hereinafter referred to as Firestone) intervened against the Tug HARD WORK, *in rem*, and Alamo, *in personam*, the M/V OVERSEAS VALDES *in rem*, and Maritime, *in personam*. Maritime then counterclaimed against Alamo for recovery over against Alamo if Maritime is found liable to Firestone. Alamo cross claimed against Maritime for recovery over if Alamo is found liable to Firestone. Alamo filed a third party complaint against Texas Chemical Plastic Corporation. Alamo had contracted with Texas Chemical Plastic Corporation to provide transportation for shipments of chemicals. Alamo claims that if it is found liable to Firestone for damage to the cargo, then Alamo is entitled to contractual indemnity from Texas Chemical Plastic Corporation.

Trial, on the issue of liability only, was set originally for February 24, 1975. Prior to the trial date, Alamo settled its dispute with Maritime and, as the settlement agreement required, assumed the defense of Maritime.

All counsel then requested that the issue of liability be submitted to the Court on consideration of the depositions of Mr. Merlin A. McKee, Mr. Gerald K. Moore, Mr. John W. Ward and Mr. Daniel H. West. Proposed findings of facts, proposed conclusions of law and trial briefs were filed by Alamo and Firestone. Texas Chemical Plastic Corporation adopted the proposed findings of facts and conclusions of law and trial memorandum submitted by Alamo.

An introductory sketch of the factual and legal contentions of the parties is necessary because of the shift in roles of several parties. Though Alamo and Maritime settled their dispute and Alamo assumed the defense of Maritime, the issue still is whether the M/V OVERSEAS VALDES's actions, the Tug HARD WORK's actions or the ac-

tions of both vessels caused the collision. The parties assume the following positions on that issue. Firestone argues that the M/V OVERSEAS VALDES caused the collision by having no lookout as mandated by 33 U.S.C. § 351, not sounding the signals as required by 33 U.S.C. § 343, having unauthorized lights in violation of 33 CFR 95.45, and by turning, in violation of 33 CFR 95.15, across the course of the Tug HARD WORK. Alamo is in the unusual position of arguing that its vessel, the Tug HARD WORK, was incompetently navigated and that the M/V OVERSEAS VALDES is blameless. Alamo argues that the rule of "special circumstances" applies in favor of the M/V OVERSEAS VALDES. Texas Chemical Plastic Corporation adopts the arguments of Alamo. Both sides argue that the conduct of their vessel was blameless. Alternatively, both sides contend that, if they are found at fault, that such fault was minor when compared to the fault of the other vessel.

After considering the depositions of Mr. McKee, Mr. Moore, Mr. Ward, and Mr. West, the stipulations agreed to by the parties, the proposed findings of facts and conclusions of law, and the trial and post-trial briefs, the Court enters the following findings of facts and conclusions of law.

## FINDINGS OF FACT

### 1.

In the early morning hours of March 17, 1972, the M/V OVERSEAS VALDES was proceeding up the Mississippi River for a planned docking at the General American Transportation Company's # 3 dock at Goodhope, Louisiana. The M/V OVERSEAS VALDES, which was operated by Maritime, was a bridge aft tanker, 660 feet long and 90 feet wide. At the time in question, the vessel was unladen except for water ballast and was drafting 9 feet forward and 19 feet, 6 inches aft. The M/V OVERSEAS VALDES possessed a single screw which was powered by steam turbine en-

gines. Those engines were capable of developing 15,000 shaft horsepower. The vessel did not have a bow thruster.

At the bow the vessel had a forecastle deck which rose 11 feet above the tank or main deck. At the bow stem on the forecastle deck, the bulwark was 4 feet high. The superstructure which was located on the aft portion of the vessel was comprised of three stories. The control room was located on the third story. The control room was located on what was called the navigation deck.

The vessel's control room contained the wheel, the engine control lever, a tachometer, a rudder angle indicator, a gyro-compass, an Easterling Angus recorder and two radar sets. The Easterling Angus recorder indicates, at the seletected time, the engine commands initiated by the engine control lever and the actual revolutions per minute of the propeller shaft. Immediate response to a movement of the engine control lever is not possible; a certain period of time is present before the engine's performance meets the control rooms requested change. The time lag is composed of two factors. The first is the time required for the machinery to make the necessary shifts. The second is the time required for the engines to decrease or increase the revolutions per minute to the requested rate. The difference between the requested and the actual performance is indicated on graph-like tapes by two lines. One line represents the order and the other represents the actual performance. A similar engine performance recorder is located in the engine room. The two radar units were described as the 10 centimeter set and the 3 centimeter set. The 10 centimeter unit has a maximum range of 40 miles and at the time in question was set for 4 miles. The 3 centimeter unit had a maximum range of one-half mile and was set for that distance at the time in question. The 10 centimeter unit was positioned on the starboard side of the control room and the 3 centimeter unit was on the port side. A bridge wing

was located on the port and starboard side of the control room and directly adjacent to the control room.

A course recorder was employed aboard the M/V OVERSEAS VALDES. The course recorder preserved a record of the vessel's course, which was expressed from 0 degrees to 360 degrees.

### 2.

During the same early morning hours of March 17, 1972, the Tug HARD WORK and its tow of one barge, the SUN-CHEM 900, were proceeding down the Mississippi River in the direction of the General American Transportation Company docks. The Tug HARD WORK, which was a steel, model bow tug, was owned and operated by Alamo. The tug measured about 48 feet in length, 18 feet beam and a depth of 5 feet. A single screw, which was powered by a 360 horsepower diesel engine, propelled the tug. The tug had a single rudder and was steered by a lever which was located in the pilothouse. The pilothouse was on the second deck of the Tug HARD WORK. The pilothouse was equipped with a radar unit, a VHF radio and an air whistle.

### 3.

The Barge SUN-CHEM 900, which was the Tug HARD WORK's tow, was a steel tank barge. The barge was about 195 feet long, 36 feet wide and 10 feet deep. At the time of the collision, the barge was carrying a cargo of 10,043 barrels of a styrene monomer. The draft of the barge was 9 feet forward and 9 feet, 6 inches aft.

### 4.

The General American Transportation Company Dock #3, which was the M/V OVERSEAS VALDES's destination, was located on the east bank (the right side going upriver) of the Mississippi River. When moving upriver, dock #3 is the first dock to be encountered at the General American Transportation Company facility. The General American Trans-portation Company facility was located on a bend of the Mississippi River. Downriver of the dock #3, the Mississippi River lay generally in a north to south direction. In the area of the dock, the Mississippi River turned and thereafter lay in approximately an east to west line. The Mississippi River was about 850 to 875 yards wide in the bend.

### 5.

At the time in question, visibility was not limited by fog and no other vessels were operating in that portion of the river.

### 6.

When navigating the Mississippi River, the normal practice of the M/V OVERSEAS VALDES was to employ a watch which would be comprised of the watch officer at the engine control lever, an able-bodied seaman at the wheel, an ordinary seaman at the bow as a lookout and an able-bodied seaman to relieve the other individuals. At the time in question, a commercial river pilot was directing the navigation of the vessel.

During the time preceding the collision of March 17, 1972, four individuals were present on the bridge of the M/V OVERSEAS VALDES. They were the quartermaster, the third mate, the pilot and the master of the vessel. As the vessel approached the dock, the master and pilot were on the starboard bridge wing. Periodically they would return to the control room to check the radar unit. Because the vessel was docking, nobody was constantly monitoring the radar units or observing the river. The quartermaster was stationed at the wheel and was making course adjustments as the commercial pilot directed. The third mate, McKee, was positioned at the engine control lever; his job was to make the necessary engine adjustments as the commercial pilot ordered.

A lookout was stationed at the bow of the vessel. The bow lookout communicated with the bridge by means of a

telephone located at his position on the bow of the vessel.

**7.**

At about 2:30 A.M. CST on March 17, 1972, the chief mate, Mr. Daniel H. West, began to make his way to the bow of the vessel. Other than the bow lookout, the chief mate was the first to arrive at the bow of the vessel. Shortly thereafter, members of the crew began moving towards the bow. The chief mate's first duty was to supervise the making fast of the Tug CECILIA BISSO to the port bow of the M/V OVERSEAS VALDES. That tug was going to aid the docking maneuvers by acting as a bow thruster for the oceangoing vessel. After several crewmen had reached the bow, the chief mate and those crew members tied the Tug CECELIA BISSO to the M/V OVERSEAS VALDES at a point about 130 feet from the bow stem of the M/V OVERSEAS VALDES. That task was accomplished at about 2:50 A.M. CST.

When the rest of the crew had congregated on the bow, the crew was split into two groups. One group moved aft to perform work necessary for the docking; the remainder stayed at the bow to perform similar duties. At sometime during these activities the bow lookout joined the bow party and thereafter aided in the docking procedure. The attention of the crew members on the bow was directed towards the dock, which was located on the starboard side of the vessel.

**8.**

The Barge SUN-CHEM 900 was equipped with a red port light, an amber middle light and a green starboard light. Those lights were mounted on stands which stood on the deck of the barge. The port and starboard lights were each screened on their inboard side.

**9.**

The Tug HARD WORK was equipped with a red port light, a green starboard light and an amber stern light.

**10.**

At the time in question, the M/V OVERSEAS VALDES was showing the normal navigation lights, masthead lights, range lights and running lights.

The perimeter of the three decks of superstructure of the M/V OVERSEAS VALDES had at regular intervals yellow passageway lights. These lights were located on the sides of the superstructure and illuminated the decks. These yellow deck lights were not on at the time of the accident.

The M/V OVERSEAS VALDES was equipped with floodlights to illuminate the main deck area. These floodlights were the type commonly known as mercury vapor lights. These lights were not on prior to or at the time of the accident.

**11.**

While tied to the M/V OVERSEAS VALDES, the Tug CECELIA BISSO was showing her work lights which were described as yellow bug lights.

**12.**

At the time in question, Mr. Gerlad K. Moore was at the controls of the Tug HARD WORK. Mr. Moore was alone in the tug's pilothouse. The captain and another tankerman were asleep. Mr. Moore's Merchant Marine license contained an endorsement which indicated his qualifications as an Ordinary Seaman, Wiper, and for Tankerman Grade B. Mr. Moore had nine months' experience at operating vessels.

The tug was about one and one-half miles above the General American Transportation Company docks when Mr. Moore checked his radar and first became aware of the presence of the M/V OVERSEAS VALDES. On the radar unit, Mr. Moore observed the General American Transportation Company docks and the outline of the banks of the river. Mr. Moore observed that the M/V OVERSEAS VALDES appeared to be stationary, closer to the east bank than his tug and tow, which were 300

feet off the east bank, and about one-fourth of a mile below General American Transportation Company's Dock # 3.

At the time of that first sighting, the Tug HARD WORK was running at full speed with the current and was making about eight miles per hour over land. Mr. Moore never changed the engine speed from the time of the first sighting until the collision. To maintain steerage when running with a strong current, power must be maintained.

No change in the course of the Tug HARD WORK was made by Mr. Moore until he sighted visually the M/V OVERSEAS VALDES. That visual sighting was made when the tug was about one-half mile above the General Transportation Company docks. Mr. Moore then initiated a starboard course change which would take him away from the east bank and into the middle of the river. Mr. Moore kept the M/V OVER-SEAS VALDES under observation and after the starboard course change, felt that he discerned a movement of the M/V OVERSEAS VALDES into the middle of the channel. Fearing a mid-channel collision between the two vessels, Mr. Moore attempted a sharp change of course to port. With this maneuver, Mr. Moore felt he could slip between the east bank and the M/V OVERSEAS VALDES. When, to Mr. Moore, his maneuvering appeared unsuccessful and a few moments before the imminent collision, Mr. Moore sounded a four whistle danger signal.

### 13.

The starboard side of the Barge SUN-CHEM 900 collided with the bow of the M/V OVERSEAS VALDES. The Barge SUN-CHEM 900 went under the M/V OVERSEAS VALDES. The Tug HARD WORK capsized and floated by the port side of the M/V OVER-SEAS VALDES.

### 14.

Prior to the collision, no passing signals were sounded by the M/V OVER-SEAS VALDES. Nobody aboard the M/V OVERSEAS VALDES was aware of the presence or course of the Tug HARD WORK and its tow until the tug sounded its danger signal a few moments before the collision. No radio contact between the vessels took place.

### 15.

The collision occurred at about 3:05 A.M. CST. According to the M/V OVERSEAS VALDES's course recorder, from a course of 358 degrees at approximately 2:50 A.M. CST, the M/V OVER-SEAS VALDES, using a port rudder, gradually changed to a course of 322 degrees. This change in course did not take the M/V OVERSEAS VALDES into the middle of the river. The M/V OVERSEAS VALDES was moving up the river close to and roughly parallel to the east bank of the river. Because of the bend in the river at that point, the course change was necessary to allow the M/V OVERSEAS VALDES to maintain its position relative to the east bank. At about 3:05 A.M. CST, a three degree change in course to the starboard was made. Therefore, the vessel's heading was 325 degrees at 3:05 A.M. CST. The M/V OVERSEAS VALDES's course could be described generally as paralleling the east bank of the river but slightly nosing in towards the General American Transportation Company's Dock # 3 as it approached the dock.

According to the engine performance recorder, the M/V OVERSEAS VALDES had been reducing speed as it approached the dock and at about 3:01 A.M. CST the shaft was making 40 revolutions per minute ahead. At 40 revolutions per minute, the M/V OVERSEAS VALDES was making about three knots over land against the current of the Mississippi River. At about 3:02 A.M. CST, there was a slight increase in the revolutions per minute of the propeller shaft. At about 3:04 A.M. CST, an order for full astern was given.

The timekeeping mechanism for the course recorder and the engine order

and performance recorder was not the same.

When the collision occurred, the M/V OVERSEAS VALDES was 800 to 1,000 feet from the General American Transportation Company's Dock #3 and about 100 to 200 feet from the east bank of the Mississippi River.

## CONCLUSIONS OF LAW

Before entering into a discussion of the parties' assertions of liability, the Court will dispose of several preliminary points.

The Court has jurisdiction of the case by virtue of the admiralty and maritime subject matter of the claims involved. U.S.C.A.Const. Art. 3 § 2; 28 U.S.C. § 1333. The Court will apply the principles and precedents of admiralty law and the Navigation Rules of Red River of the North and Rivers Emptying in the Gulf of Mexico and Tributaries (hereinafter referred to as the Western Rules). 33 U.S.C. § 301 *et seq.*

A recapitulation of the contentions of the parties is an appropriate starting point for the discussion of liability. Alamo contends that the negligent operation of the Tug HARD WORK was the sole cause of the collision. Alamo alleges that the conduct of the M/V OVERSEAS VALDES was faultless and, alternatively, if the M/V OVERSEAS VALDES is found at fault, that such fault was minor in comparison to the fault of the tug. Firestone argues that the M/V OVERSEAS VALDES failed to maintain a proper lookout as required by Western Rule 26,[1] failed

to sound a passing signal as mandated by Western Rule 18,[2] was showing improper lights in violation of 33 CFR § 95.45 [3] and in violation of 33 CFR 95.15 [4] suddenly veered into the path of the tug.

The Court will begin with a consideration of the allegations of fault of the M/V OVERSEAS VALDES. The Court's findings of fact have eliminated two of Firestone's contentions of fault on the part of the M/V OVERSEAS VALDES.

■ The Court had determined that the M/V OVERSEAS VALDES was not showing any unauthorized lights prior to or at the time of the collision. The M/V OVERSEAS VALDES was showing only the normal navigation, masthead, range and running lights. The M/V OVERSEAS VALDES did not breach 33 CFR § 95.45.

■ Second, the course recorder of the M/V OVERSEAS VALDES indicates that the M/V OVERSEAS VALDES did not make a sudden turn or swing into the path of the tug. During the time preceding the collision, the M/V OVERSEAS VALDES was steadily changing course to the port from a heading of 358° until it was on a course of 322°. It must be noted that a bend in the river existed in the area and the described course change allowed the M/V OVERSEAS VALDES, while proceeding upstream, to maintain its position roughly parallel to the east bank of the river. The 26° port course change did not bring the M/V OVERSEAS VALDES more into the middle of the river or farther away from the east

---

1. 33 U.S.C. § 351.

2. 33 U.S.C. § 343.

3. 33 CFR § 95.45 reads as follows:
   Any master or pilot of any vessel who shall authorize or permit the carrying of any light, electric or otherwise, not required by law, that in any way will interfere with distinguishing the signal lights, may be proceeded against in accordance with the provisions of section 4450, R.S., as amended, looking to a suspension or revocation of his license.

4. 33 CFR § 95.15 reads as follows:
   The pilot of an ascending steam vessel shall in no case attempt to cross the river when an ascending or descending steam vessel shall be so near that it would be possible for a collision to ensue therefrom; and conversely, the pilot of a descending steam vessel shall in no case attempt to cross the river when an ascending or descending steam vessel shall be so near that it would be possible for a collision to ensue therefrom.

bank of the river. Without such a course change, the M/V OVERSEAS VALDES would have run aground near or into the east bank of the river. The course recorder reveals that at the approximate time of the collision, a 3° starboard course change was accomplished. This change would have brought the M/V OVERSEAS VALDES from a position approximately parallel to the east bank of the river to a course more toward the dock on the east side of the river. This movement, which was a slight course change while the vessel was moving forward, may have exposed more of a broadside view of the port side of the M/V OVERSEAS VALDES to Mr. Moore from the tug's position; but the slight change did not result in a swing or movement of the M/V OVERSEAS VALDES into or toward the middle of the river. The M/V OVERSEAS VALDES did not violate 33 CFR § 95.-15.

Though safe on these two contentions, the M/V OVERSEAS VALDES is not completely faultless.

■ The Court concludes that the M/V OVERSEAS VALDES did not maintain a proper lookout as required by Western Rule 26. Western Rule 26 states "Nothing in sections 302–352 of this title shall exonerate any vessel, or the owner or master or crew thereof from the consequences . . . of any neglect to keep a proper lookout . . ." 33 U.S.C. § 351. It is undisputed that at some time during the approach to the dock, the bow lookout left his post and joined the crew members who were assembled at the bow of the vessel to aid the docking operations. The bow lookout, while he was at his post, never communicated to the bridge the presence or course of the tug. The men on the bridge never visually observed the tug prior to the collision. The attention of the personnel of the M/V OVERSEAS VALDES was directed to the dock and nobody was monitoring the traffic in the river. Nobody was aware of the presence of the tug until a few moments

before the collision when the tug sounded a danger signal. Western Rule 26 was violated by the M/V OVERSEAS VALDES.

■ The M/V OVERSEAS VALDES failed to sound the passing signal as required by Western Rule 18(b) which reads as follows:

\* \* \* \* \* \*

"When an ascending steam vessel is approaching a descending steam vessel on the river, the signals for passing shall be one distinct blast of the whistle by each vessel if passing port to port, and two distinct blasts of the whistle if passing starboard to starboard.

The pilot of the ascending steam vessel shall give the first signal for passing, which shall promptly be answered by the same signal by the pilot of the descending steam vessel, if safe to do so, and both shall be governed accordingly; but if the pilot of the descending steam vessel deems it dangerous to take the side indicated by the ascending steam vessel, he shall immediately signify that fact by sounding four or more short and rapid blasts, the danger signal, and it shall be the duty of the pilot of the ascending steam vessel to answer by a similar danger signal and the engines of both shall immediately be stopped and backed, if necessary, until signals for passing are given, answered, and understood. After sounding the danger signal by both vessels, the pilot of the descending steam vessel shall indicate by his whistle the side on which he desires to pass, and the pilot of the ascending steam vessel shall govern himself accordingly, the descending steam vessel being entitled to the right-of-way.

The pilot of the descending steam vessel shall not blow the first signal, except that if the other vessel has not whistled when the steam vessels, or the forward end of their tows, if being pushed ahead, are within one-

half mile of each other, he shall blow the first danger signal, which shall be promptly answered by a danger signal by the ascending vessel; but whether answered or not, the pilot of the descending vessel shall indicate the side on which he desires to pass, and both vessels shall be governed accordingly." 33 U.S.C. § 343(b).

It is uncontested that the M/V OVERSEAS VALDES, which was the ascending vessel, did not give the signals required by the statutory rule.

In defense to these two breaches of the statutory rules, Alamo contends that since the M/V OVERSEAS VALDES was approaching a dock, the Rule of Special Circumstances governs and the usual steering and sailing rules are inapplicable. Since to determine this issue the Court will rely upon judicial decisions which interpret the Navigation Rules for Harbors, Rivers and Inland Waters Generally (herein referred to as the Inland Articles),[5] a comparison of the special circumstances provisions of the Inland and Western Rules is appropriate. Inland Article 27 reads as follows:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." 33 U.S.C. § 212.

Western Rule 25 reads:

"In obeying and construing sections 302–352 of this title due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the said sections necessary in order to avoid immediate danger. When such departure becomes necessary neither vessel shall have the right-of-way and both shall navigate with caution until danger of collision is over." 33 U.S.C. § 350.

Due to the specific similarity between the two above cited statutory rules and the overall similarity of the complete body of Inland Articles and Western Rules, the Court will consider as persuasive in this case, which involves Western Rule 25, jurisprudence which has been formed in cases involving Inland Rule 27. *See, Pure Oil Co. v. The Fred B. Zigler,* 105 F.Supp. 121 (E.D.La.1952).

The Rule of Special Circumstances of Inland Article 27 has been construed to cover situations in which the usual steering and sailing rules, Inland Articles 17 to 27, are inapplicable. Those normal steering and sailing rules govern situations in which vessels are meeting, passing, crossing, or approaching one another. Those rules contemplate vessels which are proceeding on an ascertainable course. In situations in which vessels are not on a definite or certain course, the Rule of Special Circumstances govern. The special circumstances standards have been applied to vessels which are leaving slips, docks or piers, *The Servia,* 149 U.S. 144, 13 S.Ct. 817, 37 L.Ed. 681 (1893); *United States Lines v. The Ocean Vagrant,* 179 F.2d 495 (2nd Cir. 1950); *The Transfer No. 18,* 74 F.2d 256 (2nd Cir. 1934); *The Cherokee,* 70 F.2d 316 (2nd Cir. 1934); *The Fort St. George,* 27 F.2d 788 (2nd Cir. 1928); *The El Valle,* 25 F.2d 619 (2nd Cir. 1928); *The Socony No. 19,* 24 F.2d 653 (2nd Cir. 1928); *Lehigh Valley R.R. Co. v. Tug Blackjack 21,* 208 F. Supp. 648 (S.D.N.Y.1962), to vessels entering or approaching docks, piers and slips, *City of New York v. Morania No. 12, Inc.,* 357 F.Supp. 234 (S.D.N.Y. 1973); *The Toledo,* 70 F.Supp. 912 (E. D.N.Y.1946), to a tug which was "topping off" two barges, *Pure Oil Co. v. The Fred B. Zigler,* 105 F.Supp. 121 (E.D.La.1952), to a tug which was attempting to round with her tow, *The New York Central No. 3,* 42 F.2d 207 (2nd Cir. 1930), to a tug and its tow which were stationary and awaiting

5. 33 U.S.C. 151 *et seq.*

docking instructions, *Gulf Oil Co. v. The Socony No. 16,* 162 F.2d 869 (2nd Cir. 1947), and to a tug which was maneuvering from one side of its flotilla to the other side of the flotilla, *Diesel Tanker W. A. Weber, Inc. v. Tug Margaret McAllister,* 366 F.Supp. 974 (S.D.N.Y. 1973).

A cogent statement of the rule was presented in the case of *The Transfer No. 18,* 74 F.2d 256 (2nd Cir. 1934), in which the court stated:

> ". . . [W]here a vessel is entering or leaving a slip and has not yet begun to navigate on a steady course . . . the ordinary steering and sailing rules and signals made for vessels navigating on definite courses do not apply, but each vessel must proceed with due regard . . . to all dangers of navigation and collision." 74 F.2d at 257.

Several important points may be gleaned from the above quoted statement of the special circumstances rule.

■■ First, the statement indicates that the touchstone for the application of the rule is whether both the vessels are navigating on a steady course. When both vessels are proceeding on definite and steady courses, the normal steering and sailing rules apply; if either of the vessels is not navigating on an ascertainable course, the usual navigation rules logically cannot govern. From the evidence adduced, the Court has concluded that the M/V OVERSEAS VALDES was proceeding on a course which took the vessel along and roughly parallel to the east bank of the river and though reducing speed was moving ahead before the collision. The M/V OVERSEAS VALDES was on a definite and ascertainable course and was not performing any such unusual maneuver, as to justify the conclusion that it was not proceeding on a steady course.

Second, since Alamo seeks to employ the special circumstances rule as a defense to shield it from its failure to maintain a proper lookout and sound a passing signal, two more points can be drawn from the quotation given above from *The Transfer No. 18,* 74 F.2d 256, 257 (2nd Cir. 1934):

■ (1) Even if the Rule of Special Circumstances presented in Western Rule 25 governed, it would only render inapplicable the passing signal requirement of Western Rule 18. The obligation of Western Rule 26 to maintain a proper lookout is not vitiated by an application of Western Rule 25. Western Rule 26 states:

> "Nothing in sections 302–353 (Western Rule 25 is section 350) of this title shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. § 351.

■ (2) Assuming the special circumstances rule applied, it would not give the M/V OVERSEAS VALDES a license to navigate as it pleases. Rather, when vessels are operating in situations of special circumstances, they must give "due regard", for the presence of other vessels. Alamo cannot argue that the M/V OVERSEAS VALDES, if involved in a situation of special circumstances, could focus all its attention on the dock and ignore the traffic in the river.

■ The M/V OVERSEAS VALDES violated Wetsen Rule 18 and 26. A breach of the statutory navigational rules brings into effect the Pennsylvania Rule. *The Pennsylvania,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874). Under the Pennsylvania Rule, the vessel at fault, to escape liability, must prove that the fault could not have contributed to the causing of the collision. The M/V OVERSEAS VALDES has not carried this burden. If a lookout had sighted the tug and its tow and notified the bridge of their presence and course,

the appropriate passing signal could have been sounded and the tug possibly could have navigated accordingly. *See generally, China Union Lines v. A. O. Anderson Co.*, 364 F.2d 769 (5th Cir. 1966), *cert. denied*, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967).

Next, the Court will examine the conduct of the Tug HARD WORK and the law to be applied thereto.

First, Western Rule 18(b) which the M/V OVERSEAS VALDES violated, also was violated by the Tug HARD WORK. Western Rule 18(b) states in pertinent part:

". . . The pilot of the descending steam vessel shall not blow the first signal, except that if the other vessel has not whistled when the steam vessels, or the forward end of their tows, if being pushed ahead, are within one-half mile of each other, he shall blow the first danger signal, which shall be promptly answered by a danger signal by the ascending vessel; but whether answered or not, the pilot of the descending vessel shall indicate the side on which he desires to pass, and both vessels shall be governed accordingly." 33 U.S.C. § 343 (b).

The Tug HARD WORK did not sound timely a danger signal. A danger signal was given by the Tug HARD WORK moments before the collision. Western Rule 18 contemplates that the descending vessel, if it has not received an initial signal from the ascending vessel, should sound a danger and the appropriate passing signal at such time as to allow the vessels to avoid a collision. The Court concludes that the sounding of a danger signal without an accompanying passing signal only a few moments before an imminent collision is a violation of Western Rule 18.

Second, the Court concludes that Mr. Moore of the Tug HARD WORK failed to exercise good seaman-ship and due care in the navigation of the Tug HARD WORK. *See, Miller v. Semet-Solvay Division, Allied Chemical Corp.*, 406 F.2d 1037 (4th Cir. 1969), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). Whether this failure to apply these standards is viewed as inferentially as a requirement of Western Rule 26 [6] or as a filler for situations in which the statutory rules do not apply, the wrongful conduct furnishes a basis for liability. *See, Union Oil Company of California v. M/V Issaquena*, 470 F.2d 875 (5th Cir. 1973); *Wasson Barge Rental Co., Inc. v. Tug Carrie D.*, 296 F.Supp. 933 (E.D.La. 1969). *Compare, Miller v. Semet-Solvay Division, Allied Chemical Co., supra.* A brief review of the Tug HARD WORK's actions reveals the fault of that vessel. Mr. Moore first observed by radar, the position of the M/V OVERSEAS VALDES when the vessels were about one and one-fourth to one and three-fourths miles apart from each other. At that time, Mr. Moore thought that the M/V OVERSEAS VALDES was stationary and observed that both vessels were close to the east bank of the river with the tug being the closer. Mr. Moore should have realized immediately the risk of collision that was present if he continued on the same course. Mr. Moore did not initiate an immediate change of course but continued at full speed on the same course for about a mile until the vessels were about one-half to three-fourths of a mile apart. At that point, Mr. Moore initiated a turn to the starboard. It must be noted that in this area in question, the Mississippi River is approximately 2,500 to 2,600 feet wide and no other river traffic was present to hinder Mr. Moore's choice or area of maneuver. After initiating the belated change of course to the starboard, Mr. Moore felt that he discerned a movement of the M/V OVERSEAS VALDES toward the middle of the river. The Court has found that the M/V OVERSEAS VALDES did not

6. 33 U.S.C. § 351.

swing or move into or toward the middle of the river and that the M/V OVERSEAS VALDES was properly lighted. Mr. Moore became confused about the movements of the M/V OVERSEAS VALDES and attempted a radical maneuver to the port in hopes of navigating between the M/V OVERSEAS VALDES and the east bank of the river. This maneuver had no chance of success since the M/V OVERSEAS VALDES was in fact within 300 feet of the east bank in a 2,500 to 2,600 foot wide section of the river and was closing on a dock which was located on the east bank of the river.

In summary, the Tug HARD WORK failed to initiate prompt evasive action into the available open expanse of the river upon first observing the position of the M/V OVERSEAS VALDES. Failure to do so brought the tug into the vicinity of the M/V OVERSEAS VALDES and thereby created a risky situation. An earlier action would have avoided the dangerous situation by giving the vessels a margin of safety for passing. The possibility of collision became a certainty when Mr. Moore became confused and attempted a maneuver which had no chance of success. Mr. Moore did not exercise due care in the navigation of the Tug HARD WORK.

The failure to exercise due care in the navigation of the Tug HARD WORK was a cause of the collision. As explained above, the initial failure to take timely evasive action created the dangerous situation and the subsequent confusion and rash maneuvering were the major causes of the collision. The Court cannot conclude that the failure to give the danger and passing signal, as required by Western Rule 18, after the dangerous situation was created, was not a cause or could not have contributed to the collision. *The Pennsylvania,* 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874).

The Court has determined that both vessels were at fault. The M/V OVER-SEAS VALDES breached statutory Western Rules 18 and 26. The Tug HARD WORK violated statutory Western Rule 18 and the general practices of good seamanship and due care. Causation and the failure to displace the burden of the Pennsylvania Rule exist as to each violation.

■ The Court now faces the task of applying the decision of *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), and apportioning damages according to the comparative degree of each vessel's fault. The Court determines that the liability for this collision should be assigned at twenty percent to the M/V OVERSEAS VALDES and eighty percent to the Tug HARD WORK.

The Tug HARD WORK created a risky situation by not immediately turning into the wide open area of the river when the M/V OVERSEAS VALDES was first observed. There existed no reason why such action could not have been taken by the tug. A dangerous situation was created since this initial failure to adjust its course brought the tug and its tow on a path very near the M/V OVERSEAS VALDES. The M/V OVERSEAS VALDES was at fault for not sighting the tug, noting its course and sounding an appropriate passing signal. Such action may have avoided the collision since it would have given Mr. Moore information as to the intentions of the M/V OVERSEAS VALDES. With that information, Mr. Moore's confusion may have been averted. If doubt existed in Mr. Moore's mind as to the intentions of the M/V OVERSEAS VALDES, Mr. Moore, himself, could have dispelled his doubt by sounding timely a danger and passing signal. In summary, the Court is of the opinion that the faults of the Tug HARD WORK were the main cause of the collision. The Tug HARD WORK created the risk and then compounded the dangerous situation. Whether certain actions by the M/V OVERSEAS VALDES could have defused the situa-

tion is somewhat problematical; however, the importance of strict compliance with the statutory rules and the operation of the Pennsylvania Rule requires a finding of some liability on the part of the M/V OVERSEAS VALDES. *See, Belden v. Chase,* 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893). *See also, China Union Lines v. A. O. Anderson Co.,* 364 F.2d 769 (5th Cir. 1966) *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L. Ed.2d 805 (1967).

Accordingly, based on the foregoing Findings of Fact and Conclusions of Law,

It is hereby ordered that preparations proceed for the trial on the remaining issues, and thereafter, Judgment issue.