**ALTER COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 73–20–D.**

United States District Court,
S. D. Iowa,
Davenport Division.

April 16, 1976.

William K. Johnson, Lord, Bissell & Brook, John J. Henely, Chicago, Ill., George A. Goebel, Davenport, Iowa, for plaintiff.

Allen L. Donielson, U.S. Dist. Atty., S.D. Iowa; James R. Rosenbaum, Asst. U.S. Dist. Atty., Anthony W. Gross and Emmett B. Lewis, of Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., and Lawrence Barnett, Asst. Dist. Counsel, U.S. Army Corps of Engineers, St. Louis, Mo., for defendant.

## ORDER

STUART, District Judge.

This cause came on for trial to the Court on August 12, 1975 on the issue of liability. Plaintiff seeks to recover damages from the United States on the theory that the government lock personnel negligently utilized their statutory and regulatory power to control movements of tows in government locks and approaches so as to cause the Motor Vessel (M/V) YETTA ALTER to lose control of her tow and to subsequently collide with Dam 25 on the upper Mississippi River. The government has counterclaimed for the minimal damages to the dam resulting from the collision. The Court has jurisdiction over the case pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.* The final brief was filed March 22, 1976. After examining the transcript of the trial, the exhibits, and post-trial briefs of the parties, the Court now enters this memorandum opinion which constitutes the findings of fact and conclusions of law.

The Court holds that the primary responsibility for this accident must rest with the plaintiff. Pilot Barrier negligently operated his vessel by backing her tow out of the forebay. The Alter Company was negligent in entrusting the tow to a novice pilot under the river conditions as they existed in early January of 1973. The government personnel operating Lock and Dam 25 were guilty of incidental negligence in the performance of their duties. The Court will thus order a 90%–10% proration of the damages incurred.

Plaintiff owned the YETTA ALTER, a steel hulled river towboat 106.5 feet long and 30 feet wide powered by two diesel engines of about 900 horsepower each. Each diesel engine had an "overload" capacity which would increase the rate of engine rotation. A steering rudder was located immediately aft of each propeller and two backing rudders were located forward of each propeller, with one backing rudder located on each side of the propeller shaft. On the date of the collision with Dam 25, both engines and all steering mechanisms were in good working order.

On January 2, 1973, the YETTA ALTER departed from LaGrange, Missouri, destined for Cairo, Illinois, with a tow of eight loaded barges. The barges were each 35 feet wide and about 195 feet long. The eight barges were arranged in three rows of three barges each, except that there was no barge in the aft position of the port row. The tow was thus 585 feet long and 105 feet wide. The YETTA ALTER was made up

to the center stern barge with wire rigging or face wires, port and starboard.

Navigation of the YETTA ALTER was under the responsibility of the Master, Jimmy Hardin, and the Pilot, Gary Barrier. Hardin navigated the before watches (6 to 12) and Barrier handled the after watches (12 to 6). Captain Hardin had served on towboats for over 11 years and had made over 500 trips on the upper Mississippi River. Pilot Barrier, on the other hand, had been a pilot for less than a month and had been a steersman for about six months. He had never navigated a tow or more than four barges through any lock on the upper Mississippi or on any other river. He had never navigated a tow of any size through Lock 25.

When the YETTA ALTER departed in early January of 1973, the Mississippi was at a high water stage with floating and drifting ice which collected in the approaches to the locks. Ice conditions vary from lock to lock. Adjacent to each lock is a dam with a corresponding number. On January 2–4, 1973, dams 22, 24, 25 and 26 were at "open river". (There is no lock and dam 23) Open river indicates that the gates of the dam regulating water flow through the dam are completely raised. When the river is at open river, there generally exists a condition known as "outdraft". This is a current from the shore out into the river above the lock and dam. There was evidence that the outdraft above lock and dam 25 on January 4, 1973 was about 7 miles per hour. This was described as very severe.

The proposed journey of the YETTA ALTER and her barges would take her through four locks. The YETTA ALTER went through Lock 22 without incident.

At about midnight on January 3, 1973, the YETTA ALTER arrived at Lock 24. At this lock, ice had pushed into the forebay so that the lock operator could not open the lock gates. The lockmaster requested the YETTA ALTER to break ice in the forebay. Captain Hardin tied off the tow about ¾ of a mile above the lock and took the towboat

into the forebay to break ice. Shortly thereafter, Barrier came on duty and spent the next five hours or so breaking ice. When Hardin came back on duty, he was able to bring the tow into the forebay. Although considerable ice had been displaced from the front of the lock gates, the remaining ice still made it impossible for the tow to go into the lock. Hardin pushed the tow about 400 feet into the ice and tied the tow off to the land guidewall. He then broke free and spent over three hours breaking and working ice from the front of the tow after which he was able to push the tow into the lock chamber. When Barrier came back on duty at noon on January 4, 1973, the tow was still in the lock. Shortly thereafter, the YETTA ALTER completed the lockage at Lock 24 and proceeded downriver. It took over 12 hours of tedious and patient seamanship for the YETTA ALTER and her tow to complete the lockage at Lock 24. This contrasts sharply with the hurried effort at Lock 25.

Lock and Dam 25 is about 32 miles downriver from Lock and Dam 24. The last tie off location above Lock 25 is at Sandy Creek, three or four miles above the lock. When the YETTA ALTER was seven or eight miles above Lock and Dam 25, Barrier called the lock on his radio. He advised the lock operator, Ezra F. Williams, of his location and his tow and asked about the conditions at the lock and whether he should tie off the tow and come down "lightboat" to break ice as had been done at Lock 24. Williams advised that the dam was at open river, that there was an outdraft and ice in the forebay and stated that the boat and her barges were cleared for an approach to Lock 25.

Lock 25 is 110 feet wide and is located on the right descending bank of the Mississippi River near Winfield, Missouri. The lock facility includes a concrete, land guidewall, which extends 600 feet upriver from the lock chamber along the right descending bank. A parallel concrete wall extends 450 feet upriver at the west end of the dam and is known as the river guidewall. The area between the land guidewall and the river

guidewall is the forebay; the distance between the two is about 300 feet. A shorter wall, the "bullnose", extends about 120 feet upstream from the lock gates into the forebay. The bullnose is midway between, and parallel to, the land guidewall and the river wall. The main lock chamber is formed by lock gates located between the bullnose and the land guidewall. A revetted rock bank, or dike, extends about 1200 feet upstream from, and about 50 feet inshore of, the upriver end of the land wall. Along the length of this rock revetment, at 200 feet intervals, are six 1½ inch steel mooring cables. There are also tow mooring cables on the upriver end of the river guidewall.

On the afternoon of January 4, 1973, there was ice in the forebay at Lock 25, but it was not as severe as at Lock 24. The lock operator at 24 had been unable to open the lock gates because of the severe ice conditions. No such trouble was experienced at Lock 25. Because of the outdraft conditions, the lock personnel displayed a large orange disc and an amber light visible upriver on the upper end of the guidewall. They are displayed to warn approaching vessels of the existence of outdraft conditions at the lock.

At about 4:30 p.m. on January 4, 1973, Pilot Barrier commenced his final approach to Lock 25. He made a proper flanking approach. This flanking maneuver involved reversing engines and causing the stern of the tow to touch the upper end of the rock revetment so as to cause the head of the tow to swing in against the outdraft. When the tow was properly lined up with the guidewall, the YETTA ALTER was driven ahead at full power into the forebay ice. This flanking approach was handled skillfully.

The head of the tow moved about 300 feet, or halfway, into the forebay. The lock personnel fixed a line from the head of the tow to a shorefitting about halfway down the land guidewall. At this point, the stern of the flotilla projected about 400 feet out of the forebay. Although the tow had pushed about halfway into the forebay, and

although the lock gates were open, no ice was pushed into the lock chamber by the pressure of the tow.

Communication between Pilot Barrier and the lock personnel was established by use of a two-way speaker at the head of the tow. The words of Pilot Barrier and of the lock personnel were relayed through the mate on duty at the head of the tow, Melvin White.

When the forward progress of the tow was stopped by the ice, the tow was approximately 25 feet off the land wall. Because the tow was 105 feet wide and the lock chamber was 110 feet wide, it was necessary for the tow to be brought within five feet of the lock wall before it could enter the lock chamber. It was also necessary that the ice ahead of the tow be broken up and locked through the lock in order to remove it. In order to accomplish this, Williams told Barrier to maneuver the tow back and forth, using leverage exerted by the lock line that was fastened between the head of the tow and the mooring post, a well recognized procedure.

Lock operator Williams then directed that the tow be backed down toward the end of the land guidewall and again run ahead into the ice. Barrier complied. As the tow pushed into the forebay, it was again stopped by the ice at about the same position as on the first attempt. The ice in front of the tow had not appreciably broken up or moved into the lock chamber. Again it was decided to have the tow work on a swing line in a further attempt to move the head of the tow closer to the lock wall. Again Barrier complied. As a result of these maneuvers the tow got about ten feet closer to the land wall. This was not sufficiently close to allow the tow in the lock chamber. These maneuvers were accomplished in less than one hour.

At this point, the evidence becomes contradictory. The thrust of Barrier's and two crew members' testimony was that they were *ordered* to back "down from" the forebay in order to make a new approach into the ice. Lock operator Wil-

liams denies giving such an order and his assistant, Boyd, corroborates Williams' statement. After examining all of the evidence, the Court is of the opinion that the plaintiff's version of the incident is not supportable. The Court finds, as a matter of fact, that it was the decision of Pilot Barrier to completely back out of the forebay to make a new approach.

The factual determination that Barrier was not ordered out of the forebay is crucial to the case and deserves further comment. The mate, White, testified that such an order was given by Williams and that he relayed the order to Pilot Barrier. Barrier asserts that such an order was so given and that, but for the order from the lock operator, he would not have backed down from the forebay. However, a close examination of Barrier's testimony reveals several factual shortcomings. Barrier admitted that he did not hear the lock operator telling him to back down. Rather, he claimed that Mate White told him "you are going to have to back up beyond the wall", and that he "assumed" the mate was relaying a message from the lock operator and he "guessed" this message was an order which he was duty bound to obey. Barrier admitted that he made no effort to confirm that the message came from the lock operator or to determine that the message was indeed an order.[1] Barrier stated that he made no

protest before backing down, even though he claimed responsibility for the safety of the tow, that he was in a better position than the lock operator to determine safe seamanship, and that he felt such a maneuver was unwise. A pilot should not undertake a maneuver known to be unsafe without satisfying himself that such an order had been given by the lockmaster and questioning the advisability of such maneuver.

The Court further notes that in the written statements given the same day as the accident, Barrier did not state that the YETTA ALTER had been ordered to back down from the forebay. It is highly unlikely that Barrier would have omitted such a detail from his statements describing how the accident happened if such order had been given.

The following portion of one of the statements given by Barrier (defendant's exhibit B) is typical of both statements:

> I slowed down and let the headway run out approaching Lock # 25. Backed stern in on dike and stopped tow and flatten it out on dike. I let it drop on down towards lock. I cleared the long wall by about 12 feet. I pushed on down about 300 feet and got a line on the head. I started working the tow in on the wall. The ice held the tow off about twenty feet and the lockman told me to back the

---

1. On direct examination, pilot Barrier testified as follows:
 Q. Sir, was it your decision at the time when you were on that wall to back out of the forebay?
 A. No sir.
 Q. Whose was it?
 A. The mate told me, from the lockmaster.
 Transcript, p. 41, 1. 7–11.
 However, on cross examination, Barrier was not as positive in his testimony. Indeed, on cross examination, Barrier could only guess that the decision to back down was an order coming from the lock operator:
 Q. Did you know whether what the lock man had said was a suggestion or an order?
 A. No, I don't know how you could determine it. It was an order, I guess.
 Q. One way to determine it, wouldn't it be to try to talk to the lock man and find out?
 A. I suppose it would.

Q. Did you make any attempt to do that?
 A. No, sir, I didn't talk to the lock man.
 Transcript, p. 60, 1. 7–15.
 Barrier also admitted on cross examination that it was only his "impression" that pilots are to follow orders of lock operators. Barrier testified:
 Q. Would you feel in that situation that if you had been ordered to do something by a Corps of Engineers lock man which you felt was unsafe for your boat, wouldn't you feel that you had a responsibility to let him know that?
 A. You could probably tell him. But I was under the impression that you do what they tell you to do.
 Transcript, p. 69, 1. 17–22.
 It would seem to the Court that before a pilot undertakes a course of action known to be dangerous that it be based upon more than an impression of the lock operator's authority.

tow back up and let the ice float on down. I backed back up on the dike and flatten the tow out again and lined up for the lock. I started down again and the ice held me off the wall. I backed out and the outdraft set the tow out farther until the current caught the tow. * * *

Barrier clearly stated that the operation within the forebay was taken pursuant to the plan and direction of the lock personnel. But he fails to state that backing completely out from the forebay was undertaken upon order of the lock operator. The Court cannot accept his testimony that all actions were taken after orders by the lock operator and, that to repeat it before every sentence would have been redundant. The pilot undertook what he later recognized was a knowingly dangerous course of action by backing completely down from the forebay. If he had been ordered to do so by the lock personnel that item would have figured prominently in his statement given at the time of the casualty. Barrier's own words belie the contention that he was ordered completely out of the forebay by the lock operator.

The Court thus finds that it was Pilot Barrier who decided to back completely out of the forebay in order that a new approach could be made. Once the tow was free from the forebay and under the influence of the outdraft, immediate trouble ensued. The outdraft current carried the head of the tow toward the dam and the stern of the tow toward the rock revetment. As the stern of the YETTA ALTER neared the shore of the river, the starboard propeller grounded on the rocks, creating a risk of physical damage to the propulsion and steering system. The pilot thus released the winch tension on the starboard face wire to allow the stern of the YETTA AL-TER to swing away from the shore and avoid damage to the rudders and propeller. This movement allowed the stern barges to swing near to the rock revetment. The lock operator and his assistant had gone to the rock dike to receive a line from the stern of the tow. A line was passed from the stern of the aftmost barge to the lock personnel.

The line was 75 feet long, but was too short to reach the permanent mooring cables located on the revetment. Before a longer line could be obtained the barges were carried away from shore by the current.

When the head of the tow began to swing toward the dam pilot Barrier called for overload engine power. Even with this engine power, the tow was unable to overcome the force of the river current. Thus, the tow drifted toward the dam. Efforts were made by both the lock personnel and by the crew of the YETTA ALTER to secure lines as the tow passed the river guidewall. These efforts were unsuccessful and the head of the tow came against the dam. The entire tow then swung around and settled broadside against the dam. The face wires connecting the YETTA ALTER to the tow were only released when it became apparent that danger to the vessel and crew might result. Without the tow attached, the YETTA ALTER was able to move away from the dam. Efforts were made to remove the barges from the dam, but the current was too strong to do so. The entire tow went through the dam.

The plaintiff asserts that the Corps of Engineers employees operating Lock and Dam 25 were negligent in three respects. Each argument will be discussed in turn.

The plaintiff first contends that lock operator Williams was negligent in allowing the entire tow to proceed down river, past the last tie off position at Sandy Creek. According to plaintiff, the lock operator should have directed that Barrier tie off half the tow at Sandy Creek and make a "double trip", or he should have directed that the entire tow be tied off and that the boat alone enter the forebay "lightboat" to break ice. The Court finds that the evidence in the record does not support a finding that the failure to so direct constituted negligence on the part of lock operator Williams.

It is undisputed that at Lock 24 a procedure of breaking ice "lightboat" was utilized. But the reason that it was necessary to do this was that it was impossible for the

lock operator at Lock 24 to open the lock gates. At Lock 25, the lock gates were open and thus Williams could have reasonably concluded that special navigational procedures were not required. Given the outdraft condition, and the ice conditions on Lock 25, the Court is unable to conclude that Williams failed to exercise "due care", *Indian Towing Co. v. United States* (1955), 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48, 56, in allowing the YETTA ALTER to proceed downriver with the entire tow.

Undoubtedly Williams thought that working the tow against a line in conjunction with short runs into the ice would be sufficient to complete the lockage. This obviously is a time-consuming process and one that requires great patience. And although the testimony indicated that not much progress had been made, it appears to the Court that less than an hours' effort had resulted in at least some displacement of ice. Pilot Barrier chose to cut short this effort by his rash decision to back completely down from the forebay. Williams considered the outdraft and ice conditions and decided that no special procedures were warranted. The Court is of the opinion that he acted prudently in making that decision. There was no breach of duty in the lock operator's plan for lockage; under all the conditions, his decision was reasonably aimed at passing the tow through the lock "quickly and safely". Instructions for Operation and Maintenance of Lock & Dams No. 24, 25, & 26—Mississippi River, plaintiff's exhibit 17. The plaintiff cannot now complain that one of its own employees frustrated that effort by faulty seamanship.

The second argument raised by Alter is that the lock operator was negligent in giving the order for the tow to back completely down from the forebay into the severe outdraft under all of the circumstances. As related above, the Court has concluded as a matter of fact that such an order was not given and that the decision to

leave the forebay was made by Barrier alone. However, the Court will briefly discuss plaintiff's argument *assuming* that such an order was given by the lock operator.

The premise for plaintiff's position is that Congress has delegated to the Secretary of the Army power to promulgate regulations governing navigation. 33 U.S.C. § 1. Under this statutory power, plaintiff states that the Secretary has promulgated regulations giving lock operators complete control over all movements of vessels near or within locks. Thus, one regulation governing navigation on the upper Mississippi River states:

(a) Authority of lockmasters. The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He shall see that all laws, rules and regulations for the use of the lock and lock area are duly complied with, to which end he is authorized to give all necessary orders and directions in accordance therewith, both to employees of the Government and to any and every person within the limits of the lock or lock area, whether navigating the lock or not. No one shall cause any movement of any vessel, boat, or other floating thing in the lock or approaches except by or under the direction of the lockmaster or his assistants.

33 C.F.R. § 207.300 (1974).[2]

The Corps of Engineers has published rules which state this regulation in simpler terms:

The lockmasters have been given the same authority over your boat in the lock as traffic policemen have over your car at intersections. For your own safety you must obey their instruction.

Corps of Engineers, Locking Through. (Plaintiff's exhibit 48 for pleasure craft)

Plaintiff thus argues that this regulation imposes a duty upon lock operators to

---

2. This regulation has been amended since the date of the casualty, but the amended regulation does not change the scope of the lockmas-

ter's authority. See, 40 Fed.Reg. 32121 (July 31, 1975), 33 C.F.R. § 207.300 (1975).

give proper and safe navigational orders and that any negligent order should result in liability being placed upon the government commensurate with its negligence. Plaintiff also reasons that navigators are duty bound to obey all navigational orders or lock operators. In the Court's opinion, plaintiff's interpretation of the regulatory material is too broad.

The regulations must be read in conjunction with 33 U.S.C. § 351 (Rule 26, The Rule of Good Seamanship) which provides in part:

> Nothing * * * (in previous sections) shall exonerate any vessel, or the owner or master or crew thereof, * * of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

On its face, this statute indicates that vessel pilots are not to be relieved from the consequences of their own negligence. Thus, even if a lock operator gave an erroneous order for a tow to back down from a forebay, the pilot cannot escape liability when he knows that such an order would be dangerous to his tow. Pilot Barrier was not duty bound to follow dangerous or arbitrary orders from lock operators. Such an interpretation of the regulation defies common sense and the understanding of most of the river pilots who testified at trial. The Court cannot reach the conclusion that pilots are bound to follow unquestioningly and unhesitatingly navigational orders given by lockmen. Alter's approach to these regulations and statutes flies in the face of the maritime history of the Nation:

> In truth, every man and woman and child has a master, and worries and frets in servitude; but, in the day I write of, the Mississippi pilot had *none*. * * * The moment that the boat was underway in the river, she was under the sole and unquestioned control of the pilot. He could do with her exactly as he pleased, run her when and whiter he chose, and tie her up to the bank whenever his judgment said that course was best. His

movements were entirely free; he consulted no one, he received commands from nobody, he promptly resented even the merest suggestions. Indeed, the law of the United States forbade him to listen to commands or suggestions, rightly considering that the pilot necessarily knew better how to handle the boat than anybody could tell him.

M. Twain, Life on the Mississippi 118–19 (1951 Ed.) (Emphasis in original).

Alter's interpretation of the regulation would make the pilot in the vicinity of the lock no more than a steersman, in conflict with the Rule of Good Seamanship, the testimony of active river pilots, and history. The Court cannot accept the proposition that river pilots are duty bound, either by regulation or general negligence principles, to follow orders relating to strictly navigational maneuvers given by lock operators.

Alter's reading of the regulation has also been rejected by the Court of Appeals for the Eighth Circuit in the case of *Logan Charter Serv., Inc. v. Cargill, Inc.* (8th Cir., 1967), 373 F.2d 54. In *Logan Charter*, a collision occurred on the upper Mississippi River when the M/V CITY OF JOLIET lost control of her tow when attempting to maneuver into a lock. The tow collided with the dam and a barge sank. The trial court found that the sole proximate cause of the accident was the negligent operation and navigation by the crew of the CITY OF JOLIET. It was the plaintiff's factual assertion that the lock operator had ordered the head of the tow tied off so as to stop the tow's forward motion just as the flotilla was entering the lock. Stopping the forward motion of the flotilla in this manner caused the stern of the flotilla to be caught in an outdraft and to be carried onto the dam. The trial court, and the appellate court, rejected that factual version of the event. The finder of fact found that the tow's stern was too far outstream to properly enter the lock and that the crew should not have cast off lines when doing so would subject the tow to the outdraft. The Circuit Court did not reverse this factual determination.

One of the plaintiff's legal arguments in *Logan Charter* was that 33 C.F.R. § 207.300 (the same regulation as in the instant case) placed responsibility for safe navigation upon lock operators. The Circuit Court, relying in part upon the Rule of Good Seamanship given above, rejected such a reading of the regulation. The Court stated:

> The record shows that the locktenders were not seamen and had no control over the navigation of the flotilla other than to forbid its entry into the lock until the entrance could be safely accomplished. They could not be held responsible for the crew's failure to maneuver the flotilla into proper position to enter the lock. *Id.* at 61.

◼ The Court of Appeals reached a sensible and realistic allocation of responsibilities for safe navigation through locks consistent with all regulatory and statutory material. This Court would consider it incumbent upon lock operators to give those shore to river commands, such as how a lock line should be worked, necessary to effectuate a successful lockage, but lock operators are not in a position to judge the safety or wisdom of a navigational maneuver. That responsibility must rest upon the pilot of the vessel. Hence, a lock operator has no authority to order a pilot to back out of a forebay, and a pilot is under no compulsion to accept such an erroneous order. Indeed, it would appear that a prudent river pilot would clearly reject any such navigational order given by one on shore. The evidence in this case shows that the pilot is given responsibility for navigation, and the lock operator is given responsibility for locking. Alter's attempt to shift that responsibility must fail.

◼ Alter also argues that under the regulation, lock operator Williams should have ordered the YETTA ALTER to cease backing out of the forebay when he became aware that was the intended course of action. It appears from the record that Williams considered such a maneuver dangerous and unwise. The Court agrees that the lockmaster, because of his responsibility to perform a safe lockage and to protect the lock and dam, cannot remain silent when a pilot is attempting a maneuver a lock operator knows is unwise or unsafe. Without deciding whether he would have the authority to order the pilot not to back out of the forebay, the Court finds the evidence is clear that the lockmaster remained silent and did not question the advisability of such maneuver. The Court is of the opinion that the defendant must accept responsibility for ten per cent of the damages sustained because the lock operator stood mute in the face of a navigational maneuver known to be dangerous. Such a division of responsibility requires only that lock operators voice their concerns over known improper navigational maneuvers. The primary responsibility for safe navigation remains on the pilot.

Plaintiff finally argues that the lock operator was negligent in failing to direct that lock lines be appropriately placed for the maneuvers contemplated and directed by the lock personnel. The record indicates that the YETTA ALTER had more than the minimum number of lines under the applicable regulations. Plaintiff first contends that lock operator Williams should have directed that additional lines be broken out before he gave the order to back down from the forebay. Such a contention assumes that Williams planned and then gave such an order. The Court has found that to be an unwarranted conclusion. Williams did not order the tow to back down from the forebay and hence he cannot be held responsible for failing to order additional lines.

Alter also argues that even if the decision to back down from the forebay originated with pilot Barrier, Williams was negligent in failing to order additional lines for the maneuver after Barrier made the decision to back down. The Court has assigned a percentage of liability to defendant for the failure of the lock operator to make his concern known to the pilot. This allegation of negligence is part and parcel of the finding that a lock operator cannot remain silent in the face of a known dangerous maneuver.

The Court thus rejects all but one of plaintiff's arguments for imposing any liability upon the defendant. The Court is of the opinion that the evidence clearly indicates that this accident was primarily caused by the negligence of the plaintiff Alter Company and the negligence of pilot Barrier.

 Alter Company negligently entrusted their vessel and barges to an inexperienced pilot under severe river conditions. Such a delegation of navigation duties constitutes negligence. It is obvious that an inexperienced pilot must navigate to become experienced, but this does not justify sending a man onto the Mississippi River under dangerous conditions with a large tow when he has had no comparable experience. Barrier had been a pilot for only one month. He had never been placed in a situation as hazardous as this; his employer must assume the responsibility for his mistakes in judgment resulting from his inexperience.

Pilot Barrier was clearly negligent in deciding to back down from the forebay under the conditions as they existed. Barrier knew that backing down from the forebay was dangerous under the outdraft condition; he testified that he could feel the outdraft when he was approaching the lock. But yet he persisted in backing down. The Court is of the opinion that Barrier's "inexperience and impulsiveness", as Captain Thompson stated, transcript p. 426, 1. 17, led directly to this casualty. There were several less dangerous procedures Barrier could have used in this situation. He could have tied off to the river wall, or he could have tied off to the rock revetment and broken ice lightboat. He even could have done nothing and called upon Captain Hardin for advice. A river pilot is held to a standard of care commensurate with his important duties:

Rivers are not immutable. Rains swell their volume; the opening of dams increase their current; deposits of silt may change their depth; wrecks may obstruct them. Where the river pilot has the means of obtaining information concerning these changes, he is deemed in law to know them. If he tests the danger of increased current at a place where his common sense and nature's physical laws would tell him that a crosscurrent would embarrass his progress, he does so at his own risk.

*Utility Serv. Corp. v. Hillman Transp. Co.* (3d Cir., 1957), 244 F.2d 121, 124. See also, *City of New York v. Morania No. 12* (S.D. N.Y., 1973), 357 F.Supp. 234; and *Board of Comm'rs v. M/V Agelos Michael* (E.D.La., 1974), 390 F.Supp. 1012.

Barrier knew that he was undertaking a dangerous maneuver by backing down from the forebay. In a very real sense, Barrier challenged the Mississippi River and the river won. The plaintiff cannot now seek to shift the responsibility for Barrier's negligence to the United States.

It is the Court's opinion that a proper proration of the damages incurred by the plaintiff as a result of this unfortunate accident, is 90% to plaintiff and 10% to defendant. *United States v. Reliable Transfer Co.* (1975), 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251. It further appears that the United States is entitled to judgment on its counterclaim, stipulated at $55.38 for damage to the dam. 33 U.S.C. § 408. *United States v. Tug Colette Malloy* (5th Cir., 1975), 507 F.2d 1019. If the parties are unable to arrive at a settlement on the amount of damages, the Court should be so advised so that the damage issue may be set down for hearing.

IT IS THEREFORE ORDERED that the Clerk of the Court enter judgment in accordance with this Memorandum.